# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RÜMEYSA ÖZTÜRK,

*Petitioner*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; PATRICIA HYDE,
in her official capacity as the New England Field
Office Director for U.S. Immigration and
Customs Enforcement; MICHAEL KROL, in his
official capacity as HSI New England Special
Agent in Charge, U.S. Immigration and Customs
Enforcement; TODD LYONS, in his official
capacity as Acting Director, U.S. Immigration and
Customs Enforcement; KRISTI NOEM, in her
official capacity as Secretary of the United States
Department of Homeland Security; and MARCO
RUBIO, in his official capacity as Secretary of
State,

*Respondents.*

Case No. 1:25-cv-10695-DJC

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT**

## INTRODUCTION

1.     Rümeysa Öztürk is an international PhD student who was arrested on March 25, 2025 when six plain-clothes federal officers surrounded her on the street just outside her home in Somerville, MA. Rümeysa screamed as a man in a hooded sweatshirt grabbed her. Several other officers encircled her and soon covered their faces with masks. Rümeysa was handcuffed and escorted with an officer holding each arm into an unmarked vehicle. For more than 20 hours, her friends, family and legal counsel could not locate or contact her. After an exhaustive search, they learned that she had ultimately been removed from Massachusetts and sent more than 1,300 miles away to an ICE detention facility in Louisiana.

2.      Rümeysa has not been charged with any crime. Nor has there been any allegation that she is dangerous or a flight risk. Her arrest and detention appear to be based solely on her co-authorship of an op-ed in her school newspaper, *The Tufts Daily*, in March 2024. The piece criticized the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate as "a sincere effort to hold Israel accountable for clear violations of international law." It articulated the goals of the resolutions and the disappointment of the authors before concluding with a request that the administration "trust in the Senate's rigorous and democratic process" and "meaningfully engage with and actualize the resolutions passed by the Senate."[1]

3.      Rümeysa's arrest and detention are designed to punish her speech and chill the speech of others. Indeed, her arrest and detention are part of a concerted and systemic effort by Trump administration officials to punish students and others identified with pro-Palestine activism. When asked about Rümeysa's case, Secretary of State Marco Rubio confirmed revoking her visa, adding, "we gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses."[2]

4.      The Department of Homeland Security's website informs international students and the schools that host them that the termination of student status may result in a requirement to immediately depart the United States and may lead ICE agents to investigate whether a student has in fact departed. It makes no mention of arresting or detaining students based solely

---

[1] Rümeysa Öztürk, et al., *Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions*, The Tufts Daily (Mar. 26, 2024), www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj.
[2] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.

on the loss of status.  In this case, however, DHS grabbed, arrested, and detained Rümeysa before she had received any notice of the revocation of her student visa or her student status.

5.      Rümeysa's arrest and detention are not a necessary or usual consequence of the revocation of a visa. But like the revocation of her visa, her arrest and detention are designed to silence her, punish her for her speech, and ensure that other students will be chilled from expressing pro-Palestinian viewpoints. Her continued detention is therefore unlawful. Because the government's arrest and detention violate the First and Fifth Amendments to the United States Constitution and the Administrative Procedure Act, Rümeysa should be released.

## JURISDICTION

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause); and 28 U.S.C. § 2201 (declaratory judgment).

7.      Venue is proper because Petitioner had been detained in the District of Massachusetts by Immigration and Customs Enforcement (ICE) in Massachusetts and under the custody and control of ICE officials in Massachusetts at the time of the filing of this petition. Defendant Patricia Hyde is the Director of the Boston Field Office of ICE Enforcement and Removal Operations (ICE ERO), with authority over ICE ERO's operations and detainees in New England. Additionally, Defendant Michael Krol is the Special Agent in Charge for the Boston office of ICE Homeland Security Investigations (HSI), with authority over HSI operations and detainees in New England. At the time this petition was filed, and when the Court issued an order requiring notice prior to any transfer of the petitioner out of Massachusetts, ECF No. 3, Rümeysa had only recently been arrested in Massachusetts and had not left the custody

and control of Defendants Hyde and/or Krol in Massachusetts.[3] Sometime after receiving that order, ICE officials transferred Rümeysa to Louisiana without notifying the Court, her counsel, or Department of Justice counsel on this case. Meanwhile, Respondents withheld information about Rümeysa's location from Petitioner's counsel (and apparently, from Department of Justice attorneys on this case) until nearly 24 hours after she had been detained. On information and belief, the movement of Petitioner to other states is consistent with, and part of, ICE's pattern and practice of moving people detained for their speech to distant locations incommunicado and in secret to frustrate the ability of counsel to file habeas petitions on their behalf.

## PARTIES

8.      Petitioner Rümeysa Öztürk is a PhD student at Tufts University.  She resides in Somerville, Massachusetts. Rümeysa entered the United States on an F-1 nonimmigrant student visa.

9.      Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.

10.      Respondent Patricia Hyde is named in her official capacity as the New England Field Office Director for U.S. Immigration and Customs Enforcement.

11.      Respondent Michael Krol is named in his official capacity as the New England Special Agent in Charge for Homeland Security Investigations for U.S. Immigration and Customs Enforcement.

---

[3] Counsel for the government has stated that he "has been informed that Petitioner was detained outside of Massachusetts at the time the Petition was filed," but has not provided evidence of Rümeysa's location at the time the petition was filed, or suggested that she was not in the custody and control of ICE officials in Massachusetts, ECF No. 9 at 1 n.1.

12.     Respondent Todd Lyons is named in his official capacity as the Acting Director for U.S. Immigration and Customs Enforcement. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner.

14.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i).

## FACTS

### *Rümeysa Öztürk*

15.     Rümeysa is a doctoral candidate in Child Study and Human Development at Tufts University. Rümeysa received a master's degree from Columbia University on a Fulbright scholarship.

16.     On March 26, 2024, almost exactly one year before her arrest, Rümeysa co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged

meaningful engagement by the University administration with the Senate resolutions.

17.    In February 2025, the website Canary Mission published a profile on Rümeysa, including her photograph, claiming she "engaged in anti-Israel activism in March 2024 . . . ." The profile describes Rümeysa as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement." Its sole support for the contention that Rümeysa "engaged in anti-Israel activism" was a link and screenshots of the March 2024 opinion piece.

18.    Canary Mission's publication caused Rümeysa to fear for her safety.

### Rümeysa's Arrest Near Her Home and Continued Detention in Louisiana

19.    On March 25, 2025 at approximately 5:15 p.m., a hooded, plainclothes officer approached Rümeysa near her Somerville apartment.[4]

20.    The hooded officer grabbed Rümeysa by her wrists as she screamed. Additional officers surrounded Rümeysa as she pleaded with them. The officers placed Rümeysa in handcuffs and took her away in an unmarked vehicle.

21.    Rümeysa's friends frantically tried to find out more information about what had happened to her. At approximately 10:02 p.m., counsel for Rümeysa filed a petition for writ of habeas corpus in this Court.

22.    At approximately 10:55 p.m., the Court ordered that Rümeysa not be moved outside the District of Massachusetts without 48 hours' notice.

23.    For more than 24 hours after her arrest, Rümeysa's friends, family and legal counsel did not hear from her and could not speak to her.

24.    Because Rümeysa suffers from asthma, her family and friends worried that she

---

[4] WCVB Channel 5 Boston, *Surveillance shows Tufts graduate student detained*, YouTube (Mar. 26, 2025), https://www.youtube.com/watch?v=PuFIs7OkzYY.

could become ill without access to her medication.

25.    On the evening of her arrest, and on the following day, counsel made numerous attempts to locate Rümeysa.

26.    These efforts included contacting the offices of ICE ERO and ICE HSI. Counsel received no response to these inquiries. Counsel also called all major known ICE detention facilities in New England but were informed that Rümeysa was not there. Counsel attempted to locate her whereabouts through ICE's Online Detainee Locator System. Although the Detainee Locator indicated that Rümeysa was in ICE custody, the field for "Current Detention Facility" remained blank.

27.    A representative of the Turkish consulate went personally to ICE offices in Burlington, Massachusetts and was reportedly informed that Rümeysa was not in that office and that ICE could not provide further information about her whereabouts. Department of Justice counsel on this matter also informed counsel for Rümeysa that they could not locate her.

28.    Fearing Rümeysa could have had a medical episode, counsel contacted numerous area hospitals.

29.    At around 3 p.m. on March 26, counsel moved this Court for an order requiring Respondents to report on Rümeysa's whereabouts and permit her counsel to speak with her.

30.    Shortly thereafter, Department of Justice counsel informed Rümeysa's counsel that she had been moved to a staging facility in Alexandria, Louisiana to be transferred to South Louisiana.

31.    Counsel was finally able to speak to Rümeysa late in the evening of March 26. Counsel learned that she had suffered an asthma attack while en route to Louisiana.

*Rümeysa's Visa Revocation and Removal Proceedings*

32.    ICE uses the Student and Exchange Visitor Information System ("SEVIS") to maintain information on students who attend designated educational programs.

33.    A letter dated March 25, 2025, and addressed but not provided to Rümeysa stated that her SEVIS designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act."[5] *See* **Exhibit A**. On information and belief, a copy of the letter was provided to Tufts University.

34.    A Notice to Appear ("NTA") functions as a charging document for removal proceedings. *See* 8 U.S.C. § 1229(a).

35.    On March 25 ICE provided Rümeysa with an NTA. *See* **Exhibit B**. The NTA alleges, in part, that Rümeysa's visa "was revoked by the United States Department of State" on March 21, 2025. The NTA charges Rümeysa as deportable under INA § 237(a)(1)(B).[6]  The NTA provides no other basis for Rümeysa's removal.

36.    On information and belief, Rümeysa received no notice that her visa had been revoked prior to her arrest or the service of the NTA.

37.    The NTA indicates that Rümeysa is scheduled for an initial hearing on April 7, 2025 at 8:30 a.m.

---

[5] Section 237(a)(1)(C)(i) provides: "Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status, is deportable." 8 U.S.C. § 1227(a)(1)(C)(i). Section 237(a)(4)(C)(i) provides: "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(A)(4)(c)(i).
[6] Section 237(a)(1)(B) provides: "Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable." 8 U.S.C. § 1227(a)(1)(B).

*Rümeysa's Arrest and Detention are Part of the Trump Administration's Policy of Retaliating Against Noncitizens Who Advocate for Palestinian Rights*

38.     Rümeysa's arrest and detention reflect and are a part of the Trump administration's concerted effort to silence protected political speech.

39.     In the fall of 2023, thousands of students across the U.S. from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the United States government for Israel's policies. Opponents of these students' messages—including President Trump—have characterized their message in favor of Palestinian rights as inherently supportive of Hamas and antisemitic.

40.     During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing pro-Palestinian activities on university campuses.

41.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

42.     In the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

43.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated

the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."

### *The Trump Administration Announces its Policy to Target Speech of Noncitizens*

44.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

45.     Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

46.     Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that, applied to speech, would punish constitutionally protected criticism of the Israeli government and its policies. In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas,"

sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

47.    In or around February 2025, Respondents began implementing a policy by which they would retaliate against and punish noncitizens like Rümeysa for their constitutionally protected speech (the Policy). Under the Policy, Secretary of State Marco Rubio would revoke the visas or green cards of individuals who expressed support for Palestinian rights. These revocations would then permit the Department of Homeland Security to arrest, detain and deport such individuals.

48.    On March 6, 2025, Secretary Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation."

49.    Additionally, certain groups began publicizing the names of pro-Palestinian activists they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

50.    As illustrated *infra*, one way that Secretary Rubio is implementing the Policy is by wrongly invoking 8 U.S.C. § 1227(a)(4)(C)(i) (hereinafter "the Foreign Policy Ground"), which provides that "An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." This Provision expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or

expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (citing 8 U.S.C. § 1182(a)(3)(C)(iii)).

51.     Legislative history makes clear that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

52.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

***The Government Begins to Implement its Policy of Intimidation and Retaliation***

53.    On March 5, 2025, the State Department revoked the student visa of Ranjani Srinivasan, an Indian national and doctoral student at Columbia, under the Foreign Policy Ground. Srinivasan had previously expressed support for the rights of Palestinians. Two days later, federal immigration agents showed up at her apartment looking for her, but she did not open the door. They showed up again the following night, but she was not home. On March 13, 2025, agents returned to her home with a judicial warrant. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them.

54.    On March 8, 2025, ICE agents in plain clothes arrested Mahmoud Khalil, a legal permanent resident and recent Columbia University graduate, at his Columbia University student housing. Khalil had previously expressed support for the rights of Palestinians. The agents initially told Khalil that they were detaining him because his student visa had been revoked by the State Department, but when Khalil's attorney informed the agents that he was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too. The Notice to Appear later issued by the government to Khalil cites the Foreign Policy Ground as the basis for his arrest and removal. The agents handcuffed Khalil and placed him in an unmarked vehicle. Over the course of that evening and into the early hours of the following morning, Khalil would first be taken to an ICE field office in Manhattan and then to a detention facility in New Jersey, returning to New York to board a flight to Texas and finally to Louisiana. To date, Khalil remains detained in Louisiana.

55.     On March 8, 2025, ICE signed an administrative arrest warrant for Yunseo Chung, a legal permanent resident and Columbia University student who has lived in the United States since she was seven. Chung had previously expressed support for the rights of Palestinians. On March 10, a federal law enforcement official advised Chung's attorney that her legal permanent resident status had been revoked. On March 13, federal law enforcement agents executed a judicial search warrant at Chung's dormitory. Chung filed a complaint and petition for habeas corpus in the United States District Court for the Southern District of New York, and sought, among other things, a temporary restraining order preventing immigration enforcement officials from taking her into custody or transferring her out of the district. On March 25, 2025, the court issued such an order. *Chung v. Trump et al.*, Case No. 25-cv-02412, ECF 19 (S.D.N.Y.).

56.     On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and postdoctoral fellow at Georgetown University's School of Foreign Service. Suri's student visa was revoked pursuant to the Foreign Policy Ground. In a statement given to Fox News, DHS asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media," and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas." Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any action on behalf of Hamas. To date, Suri remains in immigration detention.

57.     On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily surrender to ICE custody. Taal had previously expressed support for the rights of Palestinians. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

### *High-Level Government Officials Confirm Rümeysa Was Targeted Because of Her Speech*

58.     Multiple government officials, including Secretary of State Marco Rubio, have confirmed that Rümeysa was targeted for arrest and detention solely because of her actual or perceived First Amendment activity.

59.     On March 21, 2025, the day Rümeysa's visa was revoked according to her NTA, Secretary Rubio announced on X.com: "We will continue to cancel the visas of those whose presence or activities have potentially serious adverse foreign policy consequences for our country . . . And we will continue to use every legal means available to remove alien enemies."

60.     After Rümeysa's arrest, a DHS spokesperson stated, "DHS and ICE investigations found Öztürk engaged in activities in support of Hamas, a foreign terrorist organization that relishes the killing of Americans . . . . A visa is a privilege, not a right. Glorifying and supporting terrorists who kill Americans is grounds for visa issuance to be terminated. This is commonsense security."[7]

---

[7] Mike Toole & Beth Germano, *Tufts University student taken into immigration custody by federal agents in Massachusetts* (Mar. 27, 2025), https://www.cbsnews.com/boston/news/tufts-university-graduate-student-somerville-ice/.

61.    In a March 27 news conference, Secretary Rubio reaffirmed that the reason for Rümeysa's arrest and detention washer actual and perceived pro-Palestinian speech and political activity.[8] At the conference, a member of the media asked Secretary Rubio to explain the specific actions that led to Rümeysa's visa being revoked. The Secretary responded "oh, we revoked her visa," and continued:

> We gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away. [. . .] We don't want it. We don't want it in our country. Go back and do it in your country. But you're not going to do it in our country."

62.    Secretary Rubio added: "Every time I find one of these lunatics I take away their visa," suggesting that hundreds of visas have been revoked in furtherance of the administration's Policy of targeting noncitizens for their pro-Palestinian speech.[9]

### *DHS Did Not Follow Ordinary Procedure*

63.    DHS maintains a website, titled "Study in the States," which "explains the student visa process, enhances coordination among government agencies, and keeps international students and the U.S. academic community better informed about pertinent rules and regulations." *About*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025), https://studyinthestates.dhs.gov/footer/about.

64.    According to Study in the States, student visa holders must maintain their status, which means "Fulfilling the purpose for why the Department of State issued you your visa" and

---

[8] *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-students-visa/5158479.
[9] *See* Madeline Halpert, *Marco Rubio says US revoked at least 300 foreign students' visas*, BBC (Mar. 27, 2025), https://www.bbc.com/news/articles/c75720q9d7lo; *see also Secretary of State Marco Rubio Remarks to the Press*, U.S. Dep't of State (March 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3/.

"Following the regulations associated with that purpose." *Maintaining Status*, Study in the

States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27, 2025),

https://studyinthestates.dhs.gov/students/maintaining-status. For F-1 student visa holders, that

purpose is "to study." *Id.*

65.    The Study in the States website lists consequences that can occur "[w]hen an F-

1/M-1 SEVIS record is terminated," including, the student "loses all on-and/or off-campus

employment authorization," the student "cannot re-enter the United States on the terminated

SEVIS record," and ICE agents "may investigate to confirm the departure of the student."

*Terminate a Student*, Study in the States, U.S. Dep't of Homeland Sec'y (last accessed Mar. 27,

2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-

terminations/terminate-a-student. Termination may require an F-1 visa holder to immediately

depart the United States. *Id.*

66.    DHS does not indicate on its Study in the States website that loss of student status

may result in immediate arrest and detention. DHS departed from these expected procedures in

arresting Rümeysa without warning or notice about the change in her student status.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of the First Amendment to the United States Constitution

67.    Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein.

68.    The First Amendment to the United States Constitution provides in part that

"Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people .

. . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First

Amendment protects past, present, and future speech, including speech by noncitizens.

69.    The Policy, and the government's implementation of the Policy as to Rümeysa—specifically, the government's targeting, arrest, transfer, and ongoing detention of Rümeysa—violate the First Amendment because they:

  a.  retaliate against and punish Rümeysa's past protected speech;

  b.  prevent her from speaking now (through detention);

  c.  attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) her future speech in the United States;

  d.  deprive those with whom she would speak of her present and future speech on matters of public concern; and

  e.  chill other individuals who express support for Palestinian rights.

70.    These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the purpose of the Policy and the government's actions implementing the Policy as to Rümeysa and those similarly situated. In government officials' own telling, the Policy is intended to silence viewpoints with which the Trump administration disagrees.

**SECOND CLAIM**
**Violation of Fifth Amendment Right to Due Process**

71.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

72.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

73.    The government's detention of Rümeysa is unjustified. The government has not

demonstrated that Rümeysa—who has no criminal history, has close ties in the Tufts community, and wishes to complete her doctoral degree at Tufts—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Rümeysa cannot be safely released back to her community.

74.     Rümeysa's detention is also punitive and bears no "reasonable relation" to any legitimate purpose for detaining her. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("nature and duration" of civil confinement must "bear some reasonable relation to the purpose for which the individuals is committed"); *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Her "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

75.     Rümeysa's arrest and detention under the Policy violate due process limitations on civil detention because they are designed to punish and silence her speech with which the government disagrees, and to chill others from expressing these viewpoints—impermissible bases for taking away individual liberty.

76.     The Policy and its implementation as to Rümeysa violate her right to due process for additional reasons as well. The government's policy of applying the Foreign Policy Ground to make such determinations concerning people like Rümeysa—who was in valid F-1 status, living peacefully in the country—is unconstitutionally vague where it is due to constitutionally protected speech.

### THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

77.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

78.    The government has adopted a policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

79.    In addition, Rümeysa's SEVIS termination notice invoked the Foreign Policy Ground.

80.    In order to be invoked in an instance involving a noncitizen's past statements, the Foreign Policy Ground requires the Secretary of State to determine that a person's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest."

81.    Here, there is no indication that the Secretary of State ever made such a determination.

82.    To the extent the Secretary of State failed to make such a determination, the invocation of the Foreign Policy Ground is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

83.     To the extent the Secretary of State purported to make such a determination, it is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

84.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

85.     Federal courts sitting in habeas possess the "inherent power to release the petitioner pending determination of the merits." *Savino v. Souza*, 453 F. Supp. 3d 441, 454 (D. Mass. 2020) (quoting *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)); *see also Da Graca v. Souza*, 991 F.3d 60 (1st Cir. 2021). Federal courts "have the same inherent authority to admit habeas petitioners to bail in the immigration context as they do in the criminal habeas case." *Id.* (quoting *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001)). "A court considering bail for a habeas petitioner must inquire into whether the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." *Id.* (quoting *Mapp*, 241 F.3d at 230) (cleaned up).

86.     This petition raises substantial constitutional and statutory claims challenging Rümeysa's retaliatory detention. Furthermore, extraordinary circumstances exist that make Rümeysa's release essential for the remedy to be effective. Even if she is ultimately freed, as long as Rümeysa remains in ICE's physical custody, she will be prevented from speaking freely and openly and her unlawful detention will serve to chill others. In addition, Rümeysa has asthma and has already suffered an asthma attack while in ICE custody, raising concerns about future asthma attacks. Finally, Rümeysa's confinement in Louisiana prevents her from

adequately litigating her removal proceedings by impeding her access to counsel and evidence located within the District of Massachusetts.

## **PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court to grant the following:

1)      Assume jurisdiction over this matter;

1)      Require Respondents to return Petitioner to this District pending these proceedings;

2)      Order the immediate release of Petitioner pending these proceedings;

3)      Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

4)      Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for arrest, detention and removal based on First Amendment-protected speech advocating for Palestinian rights;

5)      Restore Petitioner's SEVIS record;

6)      Enjoin Respondents from taking any enforcement action against Petitioner arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

7)      Award reasonable attorneys' fees and costs for this action; and

8)      Grant such further relief as the Court deems just and proper.

Respectfully submitted,

[signature block on next page]

/s/ *Jessie J. Rossman*
Jessie J. Rossman (BBO #670685)
Adriana Lafaille (BBO #680210)
Rachel E. Davidson (BBO #707084)
Julian Bava (BBO #712829)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
alafaille@aclum.org
rdavidson@aclum.org
jbava@aclum.org

Mahsa Khanbabai (BBO #639803)
115 Main Street, Suite 1B
North Easton, MA 02356
(508) 297-2065
mahsa@mk-immigration.com

Brian Hauss*
Esha Bhandari*
Brett Max Kaufman*
Noor Zafar*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
bhauss@aclu.org
ebhandari@aclu.org
bkaufman@aclu.org
nzafar@aclu.org
smahfooz@aclu.org

*Counsel for Petitioner*

*\*Pro hac vice application forthcoming*

Dated: March 28, 2025

23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 28, 2025, a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent automatically to all counsel of record.

March 28, 2025                    */s/ Jessie J.Rossman*
                                 Jessie J.Rossman