# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RUMEYSA OZTURK,** ) | |
| ) | |
| **Petitioner** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DONALD J. TRUMP, in his official capacity** ) | |
| **as President of the United States; PATRICIA** ) | |
| **HYDE, in her official capacity as the New** ) | |
| **England Field Office Director for U.S.** ) | **Case No. 25-cv-10695-DJC** |
| **Immigration and Customs Enforcement;** ) | |
| **MICHAEL KROL, in his official capacity as** ) | |
| **HSI New England Special Agent in Charge,** ) | |
| **U.S. Immigration and Customs Enforcement;** ) | |
| **TODD LYONS, in his official capacity as** ) | |
| **Acting Director, U.S. Immigration and** ) | |
| **Customs Enforcement; KRISTI NOEM, in her** ) | |
| **official capacity as Secretary of the United** ) | |
| **States Department of Homeland Security; and** ) | |
| **MARCO RUBIO, in his official capacity as** ) | |
| **Secretary of State,** ) | |
| ) | |
| **Respondents.** ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                        **April 4, 2025**

## I.     Introduction

Petitioner Rumeysa Ozturk ("Ozturk") has filed this habeas petition under 28 U.S.C.

§ 2241 (the "Petition") against the Respondents, United States government officials (collectively,

the "government"). Although the government disputes Ozturk's claims for relief, the following is

undisputed: on March 25, 2025, at approximately 5:25 p.m. without prior notice of the revocation

of her student visa or the grounds asserted for same, Ozturk, a graduate student in Child Study and

1

Human Development at Tufts University, was approached and surrounded by six officers (several wearing masks and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an unmarked vehicle. Despite the best efforts of her counsel and, even the Turkish consulate to determine her whereabouts, the government did not disclose her place of confinement until approximately 3:27 p.m. the following day, March 26, 2025. Given the period following her arrest and detention in which the government did not disclose her whereabouts, counsel for Ozturk filed the Petition in this Court, the location of her arrest and detention and the only location of her last known whereabouts, on March 25, 2025 at approximately 10:02 p.m. The government asserts that this Court lacks jurisdiction over the Petition as Ozturk, unknown to anyone but the government, was in Vermont, not Massachusetts at the time the Petition was filed and, as of 2:35 p.m. on March 26, 2025, was in Louisiana, where she remains.

Ozturk alleges that she was targeted, arrested and transferred in retaliation for exercise of her First Amendment rights (Count I), D. 12 ¶ 69, detained in violation of her Fifth Amendment right to Due Process (Count II), id. ¶ 75, and detained and subject to removal in violation of the Administrative Procedure Act ("APA") (Count III), id. ¶ 78. Ozturk requests release from custody pending adjudication (Count IV). Id. ¶¶ 84-86. Although the Petition raises serious issues as to the conduct of her arrest and detention as alleged in each of these Counts, before reaching the merits of the Petition, the Court must first address the parties' dispute about its jurisdiction. For the reasons articulated below, the Court denies the government's motion to dismiss this Petition or its request to transfer this matter to the Western District of Louisiana and, relying upon the "interest of justice" under 28 U.S.C. § 1631, transfers this matter to the District of Vermont, where Ozturk was confined overnight at the time that the Petition was filed.

II.    **Factual and Procedural Background**

A.    <u>**Ozturk's Arrest and Detention**</u>

Ozturk, a Turkish national and doctoral candidate, entered the United States pursuant to a validly issued F-1 student visa, D. 12 ¶ 8; D. 19 at 4, on June 28, 2024, D. 12-2 at 2; <u>see</u> 8 C.F.R. § 214.2(f)(5) (providing that F-1 visas are issued for the duration of a full course of study).  On March 25, 2025, Ozturk's visa was revoked, subjecting her to removal from the United States pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)."  D. 19 at 3; D. 12-1 at 2; D. 12-2 at 2.

Ozturk was given no notice of the revocation of her student visa.  D. 12 ¶ 4.  On March 25, 2025, at approximately 5:25 p.m., she was arrested and taken into custody by agents of Immigration and Customs Enforcement ("ICE") near her residence in Somerville, Massachusetts. D. 19-1 ¶ 5; D. 12 ¶¶ 19-20.  A video of Ozturk's arrest shows a hooded officer in plainclothes approach Ozturk and grab her by the wrists.  D. 12 ¶ 19 n.4; (video).  Five additional officers surrounded her, took her cell phone, placed her in handcuffs and took her away in an unmarked vehicle.  <u>Id.</u> ¶¶ 1, 20.

At some unspecified time, but prior to her arrest, ICE determined that officers would take Ozturk to Louisiana and it made flight and custody arrangements for transport.  D. 19-1 ¶¶ 6-8. According to ICE, Ozturk was to be transferred to Louisiana because "there was no available bedspace for Petitioner at a facility where she could appear for a hearing" in New England, and such out-of-state transfers are "routinely conducted after arrest, due to operational necessity considerations."  <u>Id.</u> ¶¶ 6-7.  The ICE Boston Field Office, located in Burlington, Massachusetts has administrative and operational authority over ICE arrest, removal and detention operations throughout New England, including Massachusetts, Connecticut, Maine, New Hampshire, Rhode

Island and Vermont.  D. 26-3 ¶ 6.  ICE has detention facilities for female detainees in multiple locations in New England.  Id. ¶ 9.  According to affidavits from several experienced New England immigration attorneys, it is the usual practice to have detainees, arrested on civil immigration charges, booked and processed at the ICE Boston Field Office in Burlington, Massachusetts before they are sent to a detention facility.  Id. ¶¶ 10, 12; D. 26-4 ¶¶ 4-5; D. 26-6 ¶¶ 5-6.

After Ozturk's arrest, ICE took her from Somerville, Massachusetts at 5:49 p.m., to Methuen, Massachusetts, arriving there at 6:22 p.m.  D. 19-1 ¶ 10.  Shortly thereafter, at 6:36 p.m., the officers took Ozturk from Methuen, Massachusetts and transported her to Lebanon, New Hampshire.  Id. ¶ 11.  At 9:03 p.m., ICE officials departed from Lebanon, New Hampshire, which is approximately five miles from the Vermont border, D. 19 at 5 n. 2, to transport Ozturk to the ICE Field Office in St. Albans, Vermont, where she arrived at 10:28 p.m. for processing of her Notice to Appear ("NTA") and was held there in custody overnight, D. 19-1 ¶¶ 12-13.  The next morning, March 26, 2025, at 4:00 a.m., ICE officers took Ozturk to the airport in Burlington, Vermont.  D.19-1 ¶ 16.  The flight transporting Ozturk left Burlington, Vermont at 5:31 a.m., and arrived in Alexandria, Louisiana at 2:35 p.m.  Id. ¶¶ 17-18.  From there, officers transferred her to the custody of Enforcement and Removal Operation ("ERO") New Orleans.  Id. ¶ 18.  Ozturk is currently detained in ICE custody in the South Louisiana Correctional Facility in Basile, Louisiana. Id. ¶ 19.

All of this was unknown to Ozturk's attorney, who did not know her client's whereabouts upon learning of her arrest.  D. 26-2 ¶¶ 6-7.  Close to five hours after that arrest, still having been unable to confirm her whereabouts and knowing that she had been arrested and detained in Massachusetts, Ozturk's attorney filed the Petition in this Court on her client's behalf at approximately 10:02 p.m.  D. 12 ¶ 21; D. 26-2 ¶ 2.  Shortly thereafter, at approximately 10:12

p.m., Ozturk's counsel sent of a copy of the Petition to the government's counsel.  D. 26-2 ¶ 3.
Less than an hour later, at approximately 10:55 p.m., this Court (Talwani, J.) issued an order
enjoining the government from moving Ozturk outside of Massachusetts without providing 48
hours' notice to the Court.  D. 3 ¶ 4; D. 12 ¶ 22.  Per the Court's Order, such notice was to be filed
in writing on the docket in the proceeding and was to "state the reason why the government
believes that such a movement is necessary and should not be stayed pending further court
proceedings."  D. 3 ¶ 4.  A copy of this Order was delivered to the U.S. Attorney's Office, the
government's counsel, minutes later, at approximately 10:57 a.m., via e-mail.  3/25/25 docket
entry; D. 26-2 ¶ 5.

Even after the Petition was filed on the evening of March 25, 2025, Ozturk's counsel was
unable to determine her whereabouts even in her contact with the government throughout that
evening and much of the next day.  D. 26-2 ¶¶ 6-13.  She contacted the ICE ERO in Burlington,
Massachusetts and ICE Homeland Security Investigations in Boston, Massachusetts several times
to request information, but received no response.  Id. ¶ 6.  Ozturk's attorney also was unable to
locate her via ICE's Online Detainee Locator System, where the field for "Current Detention
Facility" for Ozturk remained blank.  Id. ¶ 7.  She had several conversations with counsel for the
government who could not confirm Ozturk's whereabouts.  D. 26-2 ¶¶ 9-12; D. 12 ¶ 27.  Counsel
was concerned about her client as Ozturk suffers from asthma (a condition apparently disclosed to
officers by Ozturk upon her arrest, D. 19-1 ¶ 9) and she did not have her medication when she was
detained.  D. 26-2 ¶ 9; D. 12 ¶ 24.  A representative of the Turkish consulate even went to the ICE
Boston Field Office in Burlington, Massachusetts, and was reportedly informed Ozturk was not in
that office and ICE could not provide further information about her whereabouts.  D. 26-2 ¶ 8;
D. 12 ¶ 27.

In light of these difficulties, on the afternoon of March 26, 2025, Ozturk's attorney filed an emergency motion to compel the government to disclose Ozturk's location and permit counsel to speak with her that evening.  D. 7; D. 26-2 ¶ 13.  In that motion, counsel noted that a U.S. Senator's office had just informed her that Ozturk had been transferred to Louisiana, but neither the government's counsel nor ICE had confirmed same.  D. 7 at 1.  Shortly after Ozturk's counsel filed this motion, D. 7, at approximately 3:27 p.m. on March 26, 2025, counsel for the government informed Ozturk's attorney for the first time that Ozturk had been moved to a staging facility in Alexandria, Louisiana, to be transferred to South Louisiana.  D. 9 at 2; D. 12 ¶ 30; D. 26-2 ¶ 14. Ozturk's attorney was able to speak with Ozturk for the first time since her arrest later that night at approximately 9:45 p.m., D. 9 at 2; D. 19-1 ¶ 21; D. 26-2 ¶ 21, and learned that she had suffered an asthma attack while being transported in custody to Louisiana.  D. 12 ¶ 31.  As directed by the Court, the government filed a response to Ozturk's motion the next morning, March 27, 2025, reporting that, as was now noted in ICE's online detainee locator, Ozturk was currently confined at the South Louisiana Correctional Facility in Basile, Louisiana.  D. 9 at 1, where she remains. D. 19-1 ¶ 19.

On March 28, 2025, Ozturk filed an amended Petition, D. 12.  In light of same, the Court gave the government until 5:00 p.m. on Tuesday, April 1, 2025 to respond to it.  D. 16.  To allow resolution of its jurisdiction to decide the Petition, the Court ordered that "Ozturk shall not be removed from the United States until [its] further Order."  Id.  The government timely filed its response and requested that this Court dismiss the Petition, or, if the Court determines that transfer is appropriate, transfer the case to the Western District of Louisiana, the district where Ozturk is presently confined.  D. 19 at 28-29.  The Court ordered Ozturk to file a response by 5:00 p.m. the

following day, Wednesday April 2, 2025. D. 20. The Court heard oral argument from the parties on April 3, 2025 and took the matter under advisement. D. 41.

**B.** **Ozturk's Revocation and Removal Proceedings**

As mentioned, Ozturk was not given notice of the revocation of her visa and had not received a copy of the NTA before an immigration judge for removal proceedings before her arrest. D. 12 ¶ 36. A letter dated March 25, 2025, which was addressed to Ozturk but not provided to her before her arrest and detention, states that Ozturk's Student and Exchange Visitor Information System ("SEVIS") designation "has been terminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the Immigration and Nationality Act." D. 12 ¶ 33; D. 12-1 at 2. Also, as the government recounts, Ozturk was not served with the NTA until after she was in custody. D. 19-1 ¶¶ 13-14. The NTA orders Ozturk to appear before an immigration judge in Louisiana on April 7, 2025 for an initial hearing. D. 12 ¶ 37; D. 19-1 ¶ 15; D. 12-2 at 2.

Although the basis of her revocation is not cited in the letter to her regarding same, Ozturk was one of several authors who contributed to an editorial back on March 26, 2024 in the school newspaper, The Tufts Daily, criticizing the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate in "a sincere effort to hold Israel accountable for clear violations of international law." D. 12 ¶¶ 2, 16; D. 26 at 2; D. 26-1 at 67 ¶ 5. The President of Tufts University attests that no complaints were filed in its aftermath and there were multiple editorials published on different sides of this issue. D. 26-1 at 67 ¶ 5. As alleged, Ozturk's current visa status aligns with new policy directives from President Donald Trump who, after assuming office, signed two Executive Orders aimed at fulfilling a campaign promise to revoke the visas of students he characterized as "Hamas sympathizers." D. 12 ¶¶ 40-44. Ozturk's case is one of several cases in which the Trump Administration has implemented these Executive Orders

by revoking the immigration status of non-citizens who expressed support for Palestine.  D. 12 ¶¶ 53-57.  In such cases, the government has invoked the same provision it cited in its letter to Ozturk, 8 U.S.C. § 1227(a)(4)(C)(i), which provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."  D. 12 ¶ 50; D. 12-1 at 2; see, e.g., Chung v. Trump, No. 25-cv-02412-NRB, D. 1 (S.D.N.Y. March 24, 2025); Khalil v. Joyce, No. 25-cv-01935-JMF, 2025 WL 849803, at *1 (S.D.N.Y. Mar. 19, 2025).

## III.    Discussion

Before a Court can turn to the merits of the Petition, including Ozturk's request for immediate release, it must determine whether it has jurisdiction over this matter.  Ozturk contends that this is the appropriate tribunal for the Petition, D. 12 ¶¶ 6-7; D. 26 at 10-16, but if the Court determines that it is not, the matter should be transferred to the District of Vermont.  D. 26 at 17-19.  The government contends that the Petition should be dismissed or, alternatively, transferred to the Western District of Louisiana.  D. 19 at 6-16; 26-28.

### A.    Jurisdiction for the Petition

Ozturk filed the Petition pursuant to 28 U.S.C. § 2241, which provides in relevant part that "[w]rits of habeas corpus may be granted by . . . the district courts within their respective jurisdictions" when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241.  "Aliens in custody of federal immigration officials have traditionally been able to obtain review of immigration decisions by petitioning for a writ of habeas corpus under what is now § 2241."  Goncalves v. Reno, 144 F.3d 110, 120, 133 (1st Cir. 1998) (concluding that habeas jurisdiction permits a district court to review at least "pure issues of law concerning the applicability of statutory provisions" to immigration decisions); see Raspoutny v.

Decker, 708 F. Supp. 3d 371, 379 (S.D.N.Y. 2023) (stating that "Section 2241 permits a federal court to review 'purely legal statutory and constitutional claims' regarding immigration proceedings, but jurisdiction 'does not extend to review of discretionary determinations by the IJ and the BIA'") (quoting Sol v. I.N.S., 274 F.3d 648, 651 (2d Cir. 2001)).  Section 2241 is also the proper vehicle for petitioners challenging their detention by immigration officials pending a decision in immigration matters.  Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007) (noting that "[d]istrict courts retain jurisdiction over challenges to the legality of detention in the immigration context") (citing Hernández v. Gonzales, 424 F.3d 42, 42 (1st Cir. 2005)); Pensamiento v. McDonald, 315 F. Supp. 3d 684, 688 (D. Mass. 2018) (observing that "[d]espite . . . jurisdiction-stripping provisions, the district court may still review habeas challenges to unlawful immigration detention") (citing Aguilar, 510 F.3d at 11).  Accordingly, the Petition, filed under § 2241, is the correct vehicle for Ozturk to pursue her challenge to her arrest and detention upon the revocation of her student visa pending removal proceedings.

The government, however, contests that the District of Massachusetts is the right court to hear the Petition.[1]  As provided by statute, a habeas petition "shall allege the facts concerning the

---

[1] The government also contends that pursuant to 8 U.S.C §§ 1226(e), 1252(b)(9) and 1252(g), the Court lacks subject matter jurisdiction to review the merits of the Petition. D. 19 at 17-23.  As for §§ 1252(b)(9) and (g), the First Circuit has held that where a habeas petition raises challenges "wholly collateral" to removal, district courts are not precluded from review said petition.  See Aguilar, 510 F.3d at 10; Kong v. United States, 62 F.4th 608, 613 (1st Cir. 2023) (citing Aguilar, 510 F.3d at 11).  Likewise, the First Circuit has held that § 1226(e) does not strip district courts' ability to review habeas petitions challenging the constitutionality of a petitioner's detention.  See Hernandez-Lara v. Lyons, 10 F.4th 19, 33-34 (1st Cir. 2021) (holding that federal district courts have jurisdiction to review a habeas petition that challenges "the extent of the Government's detention authority under the 'statutory framework' as a whole") (citing Jennings v. Rodriguez, 583 U.S. 281, 295-96 (2018)); Campbell v. Chadbourne, 505 F. Supp. 2d 191, 196 (D. Mass. 2007) (stating that Congress did not express an intent in § 1226(e) to preclude judicial

application's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known," 28 U.S.C. § 2242, and a writ of habeas corpus granted by a district court "shall be directed to the person having custody of the person detained." 28 U.S.C. 2243. "Jurisdiction over the custodian is paramount because '[t]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.'" Vasquez v. Reno, 233 F.3d 688, 690 (1st Cir. 2000) (alteration in original) (quoting Braden v. 30th Jud. Cir. Ct. of Ky., 410 U.S. 484, 494-95 (1973)). Accordingly and not surprisingly, as a general rule, a petitioner must file a habeas petition in the district in which they are confined and must name as a respondent the petitioner's immediate custodian. See Rumsfeld v. Padilla, 542 U.S. 426, 442-47 (2004).

1.    The General Rule for Challenging Physical Custody is Against the Immediate Custodian and in the Place of Confinement

As to the general rule about naming the immediate custodian, the respondent is typically "the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." Padilla, 542 U.S. at 435; see Vasquez, 233 F.3d at 696 (holding that "normally" the rule is that the immediate custodian and not the Attorney General is the proper respondent in immigration habeas challenges).

Also, as a general matter, a habeas petitioner must file his or her petition in the district of confinement. Padilla, 542 U.S. at 447 (considering the proper venue for a habeas petition brought by a United States citizen designated as an "enemy combatant" who was initially detained in the Southern District of New York ("S.D.N.Y.") and was later transferred to military custody in South

---

review of constitutional challenges to detention). Here, because the Petition does not challenge the government's discretionary authority to remove her but the legality of her detention under the First and Fifth Amendments and the APA, D. 12 ¶¶ 69, 73-75, 78, the statutes do not strip the Court's jurisdiction to review the Petition here.

Carolina and filed a § 2241 habeas petition in S.D.N.Y.). Id. at 432. The Court concluded that S.D.N.Y. lacked jurisdiction over Padilla's claim because § 2241 permits a habeas petition only in "the district of confinement," and no one in S.D.N.Y. served as Padilla's immediate custodian. Id. at 442. In reaching this conclusion, the Court observed that "Congress added the limiting clause-'within their respective jurisdictions'-to the habeas statute in 1867 to avert the 'inconvenient [and] potentially embarrassing' possibility that 'every judge anywhere [could] issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat.'" Id. at 442 (alterations in original) (quoting Carbo v. United States, 364 U.S. 611, 617 (1961)). Although Ozturk's counsel observed at the motion hearing that there is some overlap in the jurisprudence about the two rules, the Padilla Court addressed them separately to say that the place of confinement rule, in conjunction with the immediate custodian rule "compose[s] a simple rule . . . [w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." Id. at 447. This rule serves the important purposes of "preventing forum shopping by habeas petitioners" and avoiding the "inconvenience, expense, and embarrassment" of district courts with overlapping jurisdiction. Id.

      2.     *There are Exceptions to these General Rules*

      a)     As Recognized in *Padilla*

Significantly, the Supreme Court in Padilla acknowledged that certain exceptions have historically applied to both of these general rules. The majority noted exceptions to the immediate-custodian rule exist when there is no immediate physical custodian with respect to the "custody" challenged. Padilla, 542 U.S. at 438-49, pointing to the Court's earlier ruling in Braden v. United States, 410 U.S. 484 (1973). In Braden, the Supreme Court considered a habeas petition filed by

an Alabama prisoner in the United States District Court for the Western District of Kentucky, which challenged a detainer lodged against him in Kentucky. Braden, 410 U.S. at 488-89. Because Braden sought to challenge "a confinement that would be imposed in the future," the Court concluded the immediate custodian rule did not apply, and Braden was instead "in custody" in Kentucky by virtue of the detainer, id. at 488-89, and while the Alabama warden was the present custodian, he was not "the person who [held Braden] in what [was] alleged to be unlawful custody." Id. at 494-95. The Padilla Court also pointed to the decision in Strait v. Laird, 406 U.S. 341 (1992), Padilla, 542 U.S. at 438-39, where it addressed an inactive reservist's § 2241 petition seeking relief from future military obligations. Id. at 344. While the petitioner was domiciled in California, the Supreme Court reasoned that because he was not challenging any present physical confinement, his "'nominal' custodian was a commanding officer in Indiana who had charge of [his] Army records." Id. In citing these precedents, the Padilla Court concluded that the "legal control" test could not be applied to physical-custody challenges to allow a convicted prisoner to name that State or the Attorney General as a respondent to its § 2241 petition, Padilla, 542 U.S. at 439-40, but acknowledged that Braden and Strait remained exceptions to the general rule.

The Supreme Court also noted an exception to this general rule regarding the immediate custody in Ex parte Endo, 323 U.S. 283 (1944), in which a Japanese-American citizen interned in California filed a § 2241 petition in the federal district court in the Northern District of California to challenge her detention, id. at 284-85; Padilla, 542 U.S. at 440. Endo had named her immediate custodian in California in her petition, but the government later transferred her to Utah. Endo, 323 at 285. The Supreme Court concluded that the subsequent transfer did not divest the Northern District of California of its jurisdiction. Id. at 304-06. Instead, "when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District

Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." Padilla, 542 U.S. at 441 (characterizing Endo's holding, and describing it as "important but limited"); see Chavez-Rivas v. Olsen, 194 F. Supp. 2d 368, 377 (D.N.J. 2002) (concluding that "where an INS-detained habeas petitioner properly files a habeas petition in the district where he is incarcerated, and the petitioner is subsequently transferred to a facility outside of that district, the Attorney General . . . may be deemed a 'custodian' to allow the original District Court to retain jurisdiction over the habeas petition"). The Supreme Court reasoned that the Endo exception did not apply to Padilla's case because Padilla had been moved from the S.D.N.Y. to South Carolina before his lawyer had filed his habeas petition, meaning jurisdiction had never vested in S.D.N.Y.  Id.

In addition, the Supreme Court noted certain exceptions legislated by Congress.  Id. at 443. Specifically, the Court in Padilla noted that it had "long implicitly recognized an exception to the immediate custodian rule in the military context where an American citizen is detained outside the territorial jurisdiction of any district court."  Id. at 436 n.9.  The majority in Padilla also acknowledged an exception relied upon by the dissent, but disagreed that it was applicable.  Citing Demjanjuk v. Meese, 784 F.2d 1114 (D.C. Cir. 1986) (Bork, J.), the majority observed that "[w]hen, as in that case, a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules," but concluded that was not Padilla's case "where the identity of the immediate custodian and the location of the appropriate district court are clear."  Padilla, 542 U.S. at 450 n.18.

b)      As proposed by the concurrence in *Padilla*

Although the 5-4 majority in Padilla applied the general rule requiring a habeas petition challenging physical custody to be filed in the place of confinement, two members of that majority,

in a concurring opinion, suggested an exception to the general rule that is implicated here. Justice Kennedy (joined by Justice O'Connor) noted that an exception to filing a petition in the district of confinement might be warranted "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." Padilla, 542 U.S. at 454 (Kennedy, J., concurring). In such a case "habeas jurisdiction would be in the district court from whose territory the petitioner had been removed." Id. (Kennedy J., concurring). Although this exception was not adopted by the majority, because Justice Kennedy and Justice O'Connor's votes were "necessary to the formation of a majority," Justice Kennedy's opinion is at least "given particular weight," Schmitz v. Zilveti, 20 F.3d 1043, 1045 (9th Cir. 1994) (citing Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1200 (11th Cir. 1982)); see Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 594 (1st Cir. 1980) (relying upon a concurrence after noting that the author's opinion was needed to make a majority); ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 499 n.3 (4th Cir. 1999) (observing that courts have given particular weight to a concurrence because the vote of each justice who joined that concurrence was "necessary to create a majority"). This is particularly appropriate where the majority in Padilla did not express disagreement with this exception proposed by the concurrence, but rather noted that the particular facts of Padilla's case did not warrant its invocation. Padilla, 542 U.S. at 441-42 (noting, by the majority, that "[t]here is no indication that there was any attempt to manipulate Padilla's transfer" and "the Government did not attempt to hide from Padilla's lawyer where it had taken him"). The majority's observation in Padilla also foreshadowed later cautions by the Supreme Court. For example, in Boumediene v. Bush, 553 U.S. 723, 732-33 (2008), the Supreme Court concluded that the Military Commissions

Act, which prohibited detainees classified as enemy combatants from petitioning for habeas corpus, was an unconstitutional suspension of the right to the writ of habeas corpus.  There, the Court described the writ as "an indispensable mechanism for monitoring the separation of powers" which it cautioned "must not be subject to manipulation by those whose power it is designed to restrain."  Id. at 765-66; see Demjanjuk, 784 F.2d at 1116 (noting that "it is essential that petitioner not be denied the right to petition for a writ of habeas corpus").

Although the government's brief does not address Justice Kennedy's proposed exception in the Padilla concurrence, see D. 19 at 13-15, courts within this Circuit and others have recognized it even as they have acknowledged that the facts in their particular case did not warrant its application.  See Khalil, 2025 WL 849803 at *6-11 (addressing Justice Kennedy's proposed exception in the Padilla concurrence); Parker v. Hazelwood, No. 17-cv-484-LM, 2019 WL 4261832, at *3-5 (D.N.H. Sept. 9, 2019) (referencing Justice Kennedy's exception, but noting that the petitioner has not "identified facts fitting this case into any of the recognized extraordinary circumstances warranting exception to the jurisdictional rules"); Xia v. King, No. 24-cv-2000-JRT-DLM, 2025 WL 240792, at *2 (D. Minn. Jan. 17, 2025) (citing Justice Kennedy's concurrence and suggesting that "[t]he Supreme Court has recognized" an exception to the district of confinement rule "where the Government was not forthcoming with respect to the identity of the custodian and the place of detention"); Gayle v. Meade, 614 F. Supp. 3d 1175, 1235 (S.D. Fla. 2020) (noting Justice Kennedy's exception and acknowledging that the Court "might entertain jurisdiction" over the claims "if there were evidence of efforts on the part of the defendants to evade jurisdiction of the Court") (quoting McKinnon v. Talladega Cnty., Ala., 745 F.2d 1360, 1363 (11th Cir. 1984)); Sow v. Whitaker, No. 18-cv-11394-GBD-RWL, 2019 WL 2023752, at *5-6 (S.D.N.Y. May 8, 2019) (noting Justice Kennedy's proposed exception but concluding that the

petitioner had failed to provide evidence showing that the government either made it difficult for his lawyer to know where he was or was not forthcoming about his place of detention); Salcedo v. Decker, No. 18-cv-8801-RA, 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 28, 2019) (citing Justice Kennedy's exception in Padilla but would continue to apply the general rule "[a]bsent contrary instruction from the Supreme Court or the Second Circuit and absent any allegation that there was an 'attempt to manipulate' [the petitioner's] transfer in bad faith"). It is also true, as the court in Khalil noted, that no court has "ever found that [Justice Kennedy's] exceptions applied" to the facts of any particular case. Khalil, 2025 WL 849803 at *2.

c)     <u>Also as recognized in the First Circuit</u>

Justice Kennedy's concurrence outlining an exception to the place-of-confinement also echoed a point the First Circuit had made four years before Padilla in Vasquez, 233 F.3d at 696, about an exception to the immediate-custodian rule. The case involved an ICE detainee who was transferred from Massachusetts to Louisiana for removal proceedings following his release from prison, who then filed a habeas petition in this Court naming the Attorney General as the defendant. Id. at 690. The First Circuit concluded that, as a general rule, the Attorney General is neither the custodian nor the appropriate respondent in a habeas case, noting that "allowing alien habeas petitioners to name the Attorney General (over whom all district courts presumably have personal jurisdiction) as a respondent will encourage rampant forum shopping." Id. at 693-94. The Vasquez court, however, noted the possibility for exceptions in "extraordinary circumstances." Id. at 696. Such extraordinary circumstances would exist if "INS [the precursor to ICE] spirited an alien from one site to another in an attempt to manipulate jurisdiction." Id. (concluding that no such "extraordinary circumstances" existed in the case where "the petitioner has neither marshaled facts suggesting furtiveness nor made a showing of the elements necessary to demonstrate bad faith").

Such concerns regarding government conduct are heightened in the case of a habeas petitioner who is an ICE detainee.  Anariba v. Dir. Hudson Cnty. Corr. Ctr., 17 F.4th 434, 447 (3d Cir. 2021). Given ICE's "broad authority to move ICE detainees" without notice, "the Government could willingly transfer an ICE detainee seeking habeas from continued detention to a jurisdiction that is more amendable to the Government's position, or the Government could transfer an ICE detainee for the purpose of intentionally introducing complicated jurisdictional defects to delay the merits review of already lengthy § 2241 claims."  Id. at 447-48.

Courts have noted that "extraordinary circumstances" could exist to invoke the exception articulated in Vasquez.  See Tham v. Adducci, 319 F. Supp. 3d 574, 577 (D. Mass. 2018) (citing Vasquez, 233 F.3d at 696) (concluding that there were "no extraordinary facts . . . that would warrant deviating from the immediate custodian rule"); Chavez-Rivas, 194 F. Supp. 2d at 376 (discussing exception under Vasquez, but disagreeing that "a petitioner should shoulder the burden of proving the Government acted in bad faith" in invoking same and that "[w]here transfer is not the result of the petitioner's misconduct, [the court] would not impose such a burden upon him"); Gayle, 614 F. Supp. 3d at 1235 n.23 (internal citation and quotation marks omitted) (some alterations in original) (citing Vasquez and other cases to suggest that "if Petitioners could satisfactorily prove their hunch ['that the ICE-facilitated transfers may be part of a shell game designed to strip the Court of jurisdiction'], then the Court might entertain jurisdiction over [their] claim[s] if there were evidence of efforts on the part of the defendants to evade the jurisdiction of the Court").

A court has invoked Vasquez in at least two cases to allow a petitioner to name the Attorney General as the respondent where ICE moved the petitioner from the district immediately after detention.  Farah v. I.N.S., No. 02-cv-4725-DSD-RLE, 2002 WL 31828309, at *2-3 (D. Minn.

Dec. 11, 2002); de Jesus Paiva v. Aljets, No. cv-036075-DWF-AJB, 2003 WL 22888865, at *4 (D. Minn. Dec. 1, 2003). In those cases, the court expressed concern that such a practice by ICE would allow it "to forum shop, intentionally or not." Farah, 2002 WL 31828309, at *3 (citing Alcaide–Zelaya v. McElroy, No. 99–cv-5102-DC, 2000 WL 1616981, at * 5 (S.D.N.Y. Oct. 27, 2000)); de Jesus Paiva, 2003 WL 22888865, at *4 (observing that "[t]o now hold that Petitioners may only file their Petition in the state that the ICE determines to send them would be to allow the ICE to forum shop") (citing Alcaide-Zelaya, 2000 WL 1616981, at *5). That the "extraordinary circumstances" described in Vasquez, 233 F.3d at 696, has not often been invoked reflects that such circumstances are rare, not that rare cases never present themselves.

### 3. Considering the Immediate-Custodian Rule in this Case[2]

The government here points to several cases to contend that the course of events surrounding Ozturk's arrest and detention do not rise to the level of "furtiveness" or "bad faith" that concerned the First Circuit in applying the immediate-custodian rule in certain "extraordinary circumstances" in Vasquez. First, it points to Ruvira-Garcia v. Guadian, No. 20-cv-2179, 2020 WL 1983875, at *2 (N.D. Ill. Apr. 17, 2020), where the district court in the Northern District of Illinois, petitioner's place of residence, concluded that it did not have jurisdiction over the petitioner who was initially detained in Wisconsin, transferred to Texas and ultimately detained in Oklahoma. Id. at *2-3. There, although the record reflected that the petitioner was not in the district at the time of filing, there was no suggestion that her whereabouts were unknown at the

---

[2] Petitioner suggests that the Court does not need to reach the exceptions because, at the time the Petition was filed, Ozturk was in transit in Vermont, making her immediate custodian the ICE New England Field Officer Director, who is based in Massachusetts. D. 26 at 12-13. Circuit law does not appear to support this position. See Vasquez, 233 F.3d at 695 (addressing Endo and Strait and U.S. ex rel. Circella v. Sahli, 216 F.2d 33, 35 (7th Cir. 1954) and summing up that "this trilogy of cases simply does not give a legitimate judicial imprimatur to a freewheeling definition of 'custodian' such as the petitioner champions").

time that her Petition was filed or that the government did not disclose her whereabouts when her counsel inquired about same.  The government also cites <u>Fuentes v. Choate</u>, 24-cv-01377-NYW, 2024 WL 2978285, at *9-10 (D. Colo. June 13, 2024), in which the court addressed the practical difficulties of a habeas petitioner challenging her detention by ICE where she was moved from a facility in Colorado to a staging facility in Arizona for eventual transfer to Texas.  <u>Id.</u> at *2.  The court concluded that it did not have jurisdiction when she was detained in Arizona and it was "not this Court's duty to ascertain or identify an Arizona official" to be named as the correct respondent. <u>Id.</u> at *9.  Recognizing petitioner's argument that she was only in Arizona temporarily and that this "present[ed] unusual logistical circumstances that likely hindered counsel's ability to act swiftly and still within the bounds of permissible habeas jurisdiction," the court declined to apply the exception in Justice Kennedy's concurrence, noting an absence of "authority from the Tenth Circuit—or weight of authority from other circuit courts—that might justify the application of such exception (however logical) by this Court."  <u>Id.</u> at *10.  In contrast, here, in the First Circuit, this Court must consider <u>Vasquez</u>.  Moreover, other than the transport of the petitioner through several states en route to another detention facility in Oklahoma, there is no suggestion in that case that the petitioner's whereabouts were unknown to her counsel at the time she filed the habeas petition.  <u>Id.</u>  In fact, the court in <u>Fuentes</u> noted that petitioner's counsel was at least informed of her transfer to Texas as it was occurring.  <u>Id.</u>

Here, the government attests that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations."  D. 19-1 at 7.  But even accepting that it is routine to move detainees between different locations before transport to their final destination, <u>see</u> <u>Sow</u>, 2019 WL 2023752, at *1-2 (reflecting petitioner's transport between locations in New York and New Jersey before

Louisiana), the government here provides no information about whether it is routine to move detainees to various locations in a single day or to have a detainee on a plane heading out of the region within twelve hours of her arrest.

Moreover, unlike the circumstances in Vasquez, 233 F.3d at 696, the petitioner has "marshaled facts" at least showing "furtiveness" on the part of the government here. Id. Ironically, the government (at least in its papers) faulted Ozturk for failing to file the Petition in the district of her confinement and failing to name her immediate custodian, D. 19 at 6-13, despite the fact that Ozturk was not permitted to communicate her whereabouts as she was transported from Somerville, Massachusetts to Methuen, Massachusetts to Lebanon, New Hampshire and then to Saint Albans, Vermont, see D. 26-7 ¶ 6 (Ozturk attesting that she kept asking to call her attorney but was told that she would be allowed to do so "once [she] reached [her] final destination"). Ozturk's attorney did not and could not have known her place of confinement or her immediate custodian at the time she filed the Petition, and even in the aftermath of that filing, the government did not disclose Ozturk's whereabouts in Vermont or her planned transport to Louisiana until a day later after she arrived in Louisiana. D. 19-1 ¶ 21.[3]

Ozturk has filed multiple affidavits from experienced, immigration attorneys in the New England area that attest that the sequence of events here was far from routine, even putting aside the circumstances of her arrest. According to these sworn statements, most ICE detainees arrested on civil immigration warrants are booked and processed in the ICE ERO Field Office in Burlington, D. 26-3 ¶ 10; D. 26-4 ¶ 5; D. 26-6 ¶ 6, and then are transferred to a detention facility.

---

[3] That ICE has an internal policy that it will notify a detainee's attorney of record of a transfer "as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs," U.S. ICE, Policy No. 11022.1(5.3)(2)(a)(2012), does not counter this conclusion here where the government was aware that Ozturk and her counsel affirmatively had requested such contact before the expiration of this time period.

D. 26-6 ¶ 6.  This was not the case with Ozturk, who was booked and processed in another city in Massachusetts, Methuen, transported to New Hampshire and then to Vermont.  Although ICE detainees might be moved during custody, D. 19-1 ¶ 7 (the Acting Deputy Field Office Director for ICE ERO attesting that "[t]ransfers out of state, and out of the ERO Boston area of responsibility, are routinely conducted after arrest, due to operational necessity and considerations"), it is unusual for that to occur within a few hours.  D. 26-3 ¶ 11; D. 26-4 ¶ 7; D. 26-5 ¶ 13; D. 26-6 ¶ 7.  Women who are detained by ICE in the region are regularly detained at facilities in New Hampshire (Strafford Jail), Rhode Island (Wyatt) and Maine (Cumberland County Jail), D. 26-4 ¶ 6, and another facility in Vermont (Chittenden Regional Correctional Facility).  D. 26-6 ¶ 9.  At least as to the facility in Maine (Cumberland County Jail), there was space for female detainees on March 25 and 26, 2025.  D. 26-5 ¶ 12.  An experienced immigration attorney working in Vermont attested that she has only experienced people being detained at the St. Albans office upon initial arrest in Vermont and has "never once encountered the case of a detained person who is being transferred into Vermont for the purposes of continued ICE detention" and that it is "even more extraordinary for a person to be transferred into the St. Albans ICE office, which is a government office and not a detention facility."  D. 26-7 ¶ 8.  The irregularity of the arrest, detention and processing here is coupled with the failure to disclose Ozturk's whereabouts even after the government was aware that she had counsel and the Petition was filed in this Court.  Moreover, contrary to counsel's arguments at the motion hearing, that the government had a pre-arranged plan for Ozturk's detention and transport before the agents effectuated her arrest does not necessarily show lack of attempt to manipulate jurisdiction where that plan continued (apparently uninterrupted) even after the government was aware of the Petition.

Even if <u>Vasquez</u>'s extraordinary circumstances exception to the immediate custodian rule did not apply here, there is also an exception to the immediate-custodian rule where the custodian of the petitioner is unknown at the time that the Petition is filed. As discussed above, in <u>Demjanjuk</u>, 784 F.2d at 1116, where the petitioner was being held by the U.S. Marshal in a confidential location, the court treated the Attorney General as the custodian and concluded that jurisdiction would lie in the D.C. Circuit at the time that the Petition was filed. <u>Id.</u>; <u>Khalil v. Joyce</u>, No. 25-cv-01963-MEF, 2025 WL 972959, at *28-37 (D.N.J. Apr. 1, 2025) (discussing <u>Demjankuk</u>).[4] Similarly, where ICE took Ozturk into custody in Massachusetts, but transported her to an unknown place, she cannot be faulted for filing the Petition in this Court against the Respondents with national and regional supervision over ICE. This is particularly true here where counsel for Ozturk could not have known to name her client's immediate custodian in Vermont, her location at the time the Petition was filed.

### 4. Considering Place-of-Confinement Rule in this Case

The same is true as to the general rule under <u>Padilla</u> and its progeny that a Petition should be filed in the petitioner's place of confinement, which we now know was the District of Vermont for Ozturk. <u>See</u> <u>Demjanjuk</u>, 784 F.2d at 1116. Despite her counsel's argument at the motion hearing, whatever the analytical overlap between this general rule and the immediate-custodian rule may be, the Court must address both rules in determining its jurisdiction. <u>Padilla</u>, 542 U.S. at

---

[4] At oral argument, in addressing <u>Demjanjuk</u>, counsel for the government argued that even if it were true that the immediate custodian was unknown at the time the Petition was filed on March 25, 2025, the Court should focus on the fact that this was no longer the case when the amended Petition was filed on March 28, 2025. Such an approach is contrary to "relate-back" rules that apply in a civil case such as this one, <u>Jaynes v. Grant</u>, No. 03-cv-11582-JLT, 2010 WL 4181241, at *2-3 (D. Mass. Oct. 19, 2010) (concluding that an amended habeas petition relates back to the original filing), particularly when the critical focus is at the time the Petition was filed. <u>See</u> <u>Padilla</u>, 542 U.S. at 441 (discussing <u>Endo</u>, 323 U.S. at 304-06).

447. It is the irregularity of the processing and transport in a single day and failure to disclose Ozturk's whereabouts discussed above as to <u>Vasquez</u> that also implicates the <u>Padilla</u> exception to the place-of-confinement rule proffered by Justice Kennedy. Justice Kennedy's remedy in this scenario would have been that "habeas jurisdiction would lie in the district or districts from which [the detainee] had been removed." <u>Padilla</u>, 542 U.S. at 454. This is the remedy that Ozturk seeks in the first instance, but argues in the alternative that transfer to the District of Vermont, D. 26 at 9, would be appropriate. This is perhaps in Ozturk's recognition of the fact that no court has yet relied upon the <u>Padilla</u> concurrence as the basis for jurisdiction. <u>Khalil</u>, 2025 WL 849803, at *2. Moreover, if the purpose of any exception to the place-of-confinement rule is to curb forum shopping by the government, <u>see</u> <u>Anariba</u>, 17 F.4th at 447, the transfer of this matter to the federal district court in the District of Vermont, the place that Ozturk was confined at the time that the Petition was filed, does so. <u>See</u> <u>Boumediene</u>, 553 U.S. at 779 (observing that "common-law habeas corpus was, above all, an adaptable remedy"); <u>Khalil</u>, 2025 WL 972959, at *35 (noting that "[p]er the Supreme Court, courts must apply the habeas statute with an eye to the underlying equitable nature of the writ") (and cases cited).

B.    **Transfer to Vermont is Warranted Here**

In the context of a habeas petition, the jurisdictional rules are "not jurisdictional in the sense of a limitation on subject-matter jurisdiction," but rather akin to "personal jurisdiction or venue." <u>Padilla</u>, 542 U.S. at 451 (Kennedy, J., concurring); <u>Tham</u>, 319 F. Supp. 3d at 576 n. 2. There are a number of transfer statutes, 28 U.S.C. §§ 1404(a), 1406(a), 1631, but the most applicable here appear to be the latter two, §§ 1406(a) and 1631. If a case is filed in the wrong venue, 28 U.S.C. § 1406(a) permits the district court in the district in which the case was filed to "transfer such case to any district or division in which it could have been brought" if such transfer

serves "the interest of justice." Id.; Tham, 319 F. Supp. 3d at 577. If "there is a want of jurisdiction," as the Court concludes here, 28 U.S.C. § 1631 permits transfer of a civil action to any court "in which the action . . . could have been brought at the time it was filed or noticed," if such transfer "is in the interest of justice." In Hoffman v. Blaski, 363 U.S. 335, 342-44 (1960), the Supreme Court considered whether the phrase "where it might have been brought" in § 1404(a) required the transferee court to have jurisdiction at the time the original action was filed, or whether it permitted transfer to a court that would have had jurisdiction at the time of the transfer only. The Court concluded that the "unambiguous, direct (and) clear" language of the transfer statute permitted transfer only in the former case. Id. Courts have concluded that Hoffman's limitation also applies to the "could have been brought" language in §§ 1406(a) and 1631. See, e.g., Gonzalez v. Grondolsky, 152 F. Supp. 3d 39, 47 (D. Mass. 2016).

"Want of jurisdiction" under § 1631 means a lack of either personal or subject matter jurisdiction. See HC&D, LLC v. Precision NDT & Consulting, LLC, 698 F. Supp. 3d 180, 197-98 (D. Mass. 2023) (internal citation omitted). Once transferred, "the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." 28 U.S.C. § 1631; see Khalil, 2025 WL 972959, at *14-20 (discussing § 1631). Such transfer treats the transferred case as if it was filed at the time of the original filing; here, it would treat the Petition as filed in Vermont on March 25, 2025 at 10:02 p.m. Gonzalez, 152 F. Supp. 3d at 47; see Miller v. United States, 753 F.2d 270, 276 (3d Cir. 1985); Martinez-Nieto v. Att'y General, 805 F. App'x 131, 135 (3d Cir. 2020).

The First Circuit has recognized that § 1631 applies in the context of habeas petitions. See Tham, 319 F. Supp. 3d at 577-78 (transferring a habeas petition pursuant to § 1631 and noting that

"there is a rebuttable presumption in favor of transferring a case instead of dismissing it"); Del Carvalho v. Moniz, No. 21-cv-11946-WGY, 2021 WL 5811301, at *1 (D. Mass. Dec. 7, 2021) (transferring a habeas petition to New Hampshire pursuant to § 1631 and "in the interest of justice").

Under either statute, however, an action may only be transferred to the court where it "could have been brought." 28 U.S.C. §§ 1406(a), 1631.[5] Here, because Ozturk was confined overnight in Vermont when the Petition was filed, the District of Vermont is the proper transferee court.[6]

## IV.    Conclusion

For the reasons articulated below, the Court DENIES the government's motion to dismiss this Petition and its alternative request to transfer this matter to the Western District of Louisiana. The Court ALLOWS the alternative relief sought by Ozturk and transfers this matter "in the interest of justice" pursuant 28 U.S.C. § 1631 to the U.S. District Court for the District of Vermont.

To ensure that Ozturk has an opportunity to have the Petition considered by the District of Vermont, and to preserve the status quo, this Court's March 28, 2025 Order enjoining the government from removing her from the United States, D. 16, shall remain in effect unless and until the transferee court orders otherwise. See Khalil, 2025 WL 849803, at *14 (ordering same upon transfer).

**So Ordered.**

---

[5] For at least this reason, the Court rejects the government's argument that if it did not dismiss the Petition, it should instead transfer it to the Western District of Louisiana, where Ozturk was not detained at the time of the filing of the Petition.

[6] It will be for the District of Vermont to determine if it has jurisdiction over Ozturk's Petition notwithstanding her later transfer to Louisiana after the filing of the Petition that is now transferred there. See Khalil v. Joyce, 2025 WL 972959, at *24-38 (taking transferred petition as filed in New Jersey at the time it had been filed in S.D.N.Y.).

/s Denise J. Casper
United States District Judge