```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    RUMEYSA OZTURK,                      )
                                          )
4                      Plaintiff          )
                                          )   No. 1:25-cv-10695-DJC
5    vs.                                  )
                                          )
6    PATRICIA HYDE, et al.,               )
                                          )
7                      Defendants.        )
                                          )
8                                         )
                                          )
9

10

11           BEFORE THE HONORABLE DENISE J. CASPER
                  UNITED STATES DISTRICT JUDGE
12                      MOTION HEARING

13

14

15
              John Joseph Moakley United States Courthouse
16                      Courtroom No. 11
                        One Courthouse Way
17                  Boston, Massachusetts 02210

18
                          April 3, 2025
19                          2:00 p.m.

20

21
                    Kristin M. Kelley, RPR, CRR
22                    Official Court Reporter
             John Joseph Moakley United States Courthouse
23                 One Courthouse Way, Room 3209
                     Boston, Massachusetts 02210
24                   E-mail: kmob929@gmail.com

25           Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2              Adriana Lafaille
               Jessie J. Rossman
3              Julian Bava
               Rachel Davidson
4              Noor Zafar
               Brian Hauss
5              ACLU of Massachusetts
               One Center Plaza
6              Suite 850
               Boston, MA 02108
7              617-482-3170
               alafaille@aclum.org
8              jrossman@aclum.org
               jbava@aclum.org
9              rdavidson@aclum.org
               for Petitioner.
10

11             Mahsa Khanbabai
               Khanbabai Immigration Law
12             115 Main Street
               Ste 1b
13             North Easton, MA 02356
               508-297-2065
14             mahsa@mk-immigration.com
               for Petitioner.
15

16             Katherine Rosenfeld
               Matthew Brinckerhoff
17             Sonya Levitova
               Vasudha Talla
18             Emery Celli Brinckerhoff Abady Ward & Maazel LLP
               One Rockefeller Plaza
19             8th Floor
               New York, NY 10020
20             212-763-5000
               krosenfeld@ecbawm.com
21             mbrinckerhoff@ecbawm.com
               slevitova@ecbawm.com
22             vtalla@ecbawm.com
               for Petitioner.
23

24

25

1    APPEARANCES CONT'D:

2

3           Mark Sauter
           DOJ-USAO
4           Moakley U.S. Courthouse
           One Courthouse Way
5           Ste 9200
           Boston, MA 02169
6           617-748-3347
           mark.sauter@usdoj.gov
7           for Respondents.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
  1                    P R O C E E D I N G S
  2              THE CLERK:  All rise.
  3              (The Honorable Court entered.)
  4              THE CLERK:  Civil Action No. 25-10695, Ozturk vs.
02:00  5    Hyde.
  6              THE COURT:  Good afternoon, counsel.  I'll have you
  7    introduce yourselves for the record.
  8              MS. ROSSMAN:  Good afternoon, your Honor.  Jessie
  9    Rossman on behalf of petitioner.
02:00 10              THE COURT:  Good afternoon.
 11              MS. LAFAILLE:  Good afternoon, your Honor.  Adriana
 12    Lafaille on behalf of the petitioner.
 13              THE COURT:  Good afternoon.
 14              MS. DAVIDSON:  Good afternoon, your Honor.  Rachel
02:01 15    Davidson for the petitioner.
 16              THE COURT:  Good afternoon.
 17              MR. BAVA:  Good afternoon, your Honor.  Julian Bava
 18    for the petitioner.
 19              THE COURT:  Good afternoon.
02:01 20              MS. KHANBABAI:  Good afternoon, your Honor.  Mahsa
 21    Khanbabai for the petitioner.
 22              THE COURT:  And there are two attorneys on Zoom?
 23              MS. ZAFAR:  Good afternoon.  Noor Zafar for the
 24    petitioner.
02:02 25              MR. HAUSS:  Good afternoon, your Honor.  Brian Hauss
```

1     for the petitioner.

2              THE COURT:  Good afternoon to you both as well.

3              Counsel?

4              MR. SAUTER:  Good afternoon.  AUSA Mark Sauter on

02:02  5     behalf of the defendant.

6              THE COURT:  Good afternoon.

7              Counsel, I know we're here on the petitioner's

8     petition.  I've had a chance to read the briefs on either side

9     and the submissions as well.  I'm prepared to hear argument.

02:02 10     As you might imagine, and certainly as your briefs anticipated,

11     I'm very focused on jurisdiction.  So I would like to start

12     there, counsel.

13              I'll hear from the petitioner first.

14              MS. ROSSMAN:  Thank you, your Honor.  Attorney

02:02 15     Lafaille will be addressing jurisdiction.

16              THE COURT:  Thank you.

17              MS. LAFAILLE:  Are you referring to the habeas?

18              THE COURT:  Yes.

19              MS. LAFAILLE:  I can start there.

02:02 20              THE COURT:  I'm focused on 2142.

21              MS. LAFAILLE:  Understood.  Your Honor, first of all,

22     we're incredibly grateful for the Court's attention to this

23     matter on such a short time frame.

24              THE COURT:  Pardon me for one second.  Can we mute

02:03 25     Zoom?

1          Counsel?

2          MS. LAFAILLE:  We're here, as your Honor knows, to

3     address the case of a student who was grabbed by federal agents

4     in front of her home and then taken over the course of several

02:03 5     hours, to Vermont without any ability to contact counsel,

6     without the ability for counsel to contact her, and with her

7     location for a period of about 22 hours being undisclosed, even

8     to the Department of Justice attorneys on this case.

9          We've talked in our briefs about some of the

02:03 10     exceptions to the general rule for habeas venue and

11     jurisdiction.  I do want to first make argument that this

12     rule -- this case actually falls within general venue

13     principles, and there's actually no need to invoke any

14     exception, but to the extent the Court disagrees, we also fall

02:04 15     within several of those exceptions.

16          So as the Court is aware, there's the general rule,

17     and as the government cites, is that the parties have to sue

18     the immediate custodian.  In this case, we've done exactly

19     that.  Miss Ozturk was not at any detention facility at the

02:04 20     time this petition was filed at approximately 10:02 p.m.  She

21     was, it appears to be, in a car or a vehicle of some sort being

22     transported between locations.

23          THE COURT:  And, counsel, I understood that you were

24     relying, at least in part or in alternative, to the unknown

02:05 25     custodian concept?

1          MS. LAFAILLE:  Yes.  And I can address that, your

2   Honor.  I don't think we even need to go there because this is

3   a case where we did name the right custodian.

4          Our client was, at the time she was detained, in the

02:05  5   custody of ICE Boston, ICE's Boston field office, and certainly

6   before she left Massachusetts if a habeas petition had been

7   filed, again, she was not in a detention facility, she's just

8   in a vehicle, certainly the government would agree we could

9   have filed that petition in Massachusetts.  And I assume the

02:05 10   government would agree that the custodian would be the director

11   of the ICE field office, which has control over ICE in New

12   England, and not the individual ICE officer in whose vehicle

13   she is or the two or three ICE officers with her in that

14   vehicle.

02:05 15          And that didn't change when she crossed the state

16   lines.  The custodian here --

17          THE COURT:  Even the state lines into Vermont?

18          MS. LAFAILLE:  Correct, your Honor.

19          The custodian, this is not one of those cases where,

02:06 20   you know, the typical case in which a petitioner is in a

21   facility detained outside of a jurisdiction.  Our client was

22   simply in a vehicle in the custody of the ICE officers.  The

23   government hasn't told us who they think the appropriate

24   custodian is.  They noted we haven't named the appropriate

02:06 25   custodian.

1       Unless the appropriate custodian is the ICE officers

2   in whose vehicle she is, I think it's clear that the

3   appropriate custodian would have to be the head of New

4   England's ICE office.  That's Patricia Hyde, who we've named,

02:07  5   and this is the Court with jurisdiction over Patricia Hyde.

6       So as the general rule is articulated in *Padilla*, and

7   there's a very clear articulation in the first few lines of

8   Justice Kennedy's concurrence that explains that this general

9   rule is you have to sue the immediate custodian in the place

02:07  10   where the immediate custodian is.

11       Normally, the very meaning of the immediate custodian

12   is that the immediate custodian and the petitioner are in the

13   same place, but this happens to be an odd situation where she

14   was in a vehicle that had crossed state lines, and so the

02:07  15   immediate custodian is still the head of New England's ICE

16   office who's based here in Massachusetts.

17       So we think it's clear under general principles, even

18   as articulated in the government's brief, that we sue the

19   immediate custodian, and we've done just that.  So this is

02:07  20   unlike -- I know the parties cited to the briefing in the

21   *Khalil* case down in the Southern District of New York and the

22   District of New Jersey, and this has some distinctions with

23   that case, in that Mr. Khalil had already reached a detention

24   facility in New Jersey at the time the petition was filed.

02:08  25       That's not our case here.  For that reason, we think

1    that we fall within general habeas jurisdiction principles even

2    without relying on the exceptions.

3         But to move on to those exceptions, as your Honor

4    mentioned, there is an exception where the custodian is unknown

02:08  5    and that exception is recognized by the *Padilla* majority in a

6    footnote.  It's also implicitly recognized in 28 U.S.C. 2242

7    which asks us, requires habeas petitioners to name the

8    custodian if known.  And, essentially, what that case law

9    establishes is, if you don't know the custodian, it's okay to

02:09 10    sue the supervisory official in the place where the supervisory

11    official is, and that's exactly what we've done here.  The

12    habeas petition was filed at the place of the local supervisor

13    in the place where the supervisor is.

14         THE COURT:  Isn't there also language in that Judge

02:09 15    Bork decision that once you know who the custodian is, to the

16    extent that that gives you jurisdiction over the custodian,

17    that disappears?

18         MS. LAFAILLE:  I don't think the jurisdiction -- I may

19    not be understanding your Honor's question.

02:09 20         THE COURT:  So meaning, at some point -- and I

21    understand the point about it not being known at the time that

22    the petition is filed given now the factual record about where

23    your client was at the time, but I do recall that there was

24    language in that decision about what happens once the custodian

02:10 25    is known.  Should it become known that the petitioner is held

in a jurisdiction other this one, a judge of this circuit would
be divested of jurisdiction.

So what would you have the Court do with that?

MS. LAFAILLE:  So I think I want to understand this
case in light of how the Supreme Court cited it.  What the
Supreme Court said is that, in this circumstance where the
custodian and location are unknown, the regular rules, the
regular immediate custodian rule doesn't apply.  And so that --
that's all I draw from the citation of that exception in
*Padilla*, is that this is a recognized exception where if there
isn't a known custodian, the rules bend a little bit.  And,
again, we don't even think we're bending the rules, but the
rules bend a little bit.  And here we have personal -- we've
sued in a place with personal jurisdiction over the custodian
and where the client was -- where our client was detained.

THE COURT:  And my memory is that when you're reciting
to *Padilla* in this regard, that's the majority in *Padilla*.

MS. LAFAILLE:  Exactly, your Honor.

And there are two other exceptions recognized -- well,
recognized in the concurrence in *Padilla*, which I think are
perhaps less well established than the unknown custodian
exception, which is when the government is not forthcoming with
respect to the identity of the custodian --

THE COURT:  And so, counsel, before jumping to that,
as I understand it, there are two issues, right?  There's the

1    immediate custodian and then there's a place of confinement.

2    So are there other exceptions as to the immediate custodian

3    that you would have me consider?  I think the parties on both

4    sides had cited to *Vasquez*.

02:12   5         MS. LAFAILLE:  *Vasquez* I think is just establishing,

6    it's a case pre-dating *Padilla*, if I recall correctly, and is

7    establishing the general rule that, even in immigration cases,

8    we typically should sue the immediate custodian.  This is a

9    case where, you know, we're not talking about cases where it's

02:13  10   unknown who the immediate custodian is.

11         THE COURT:  Right.

12         MS. LAFAILLE:  Under this circumstance, we have not

13   only --

14         THE COURT:  And, counsel, I apologize if I wasn't more

02:13  15   precise.  I was talking about the language in *Vasquez* that

16   refers to exceptional circumstances, when you would depart from

17   that general rule.

18         MS. LAFAILLE:  Exactly.  This is a case that has a

19   number of those exceptional circumstances.  Because of the --

02:13  20   we've submitted a number of declarations just attesting to,

21   and, again, this is where this case differs from the *Khalil*

22   circumstances in the Southern District of New York where Judge

23   Furman said he did not believe, had been shown that the

24   circumstances were unusual.  Here we've submitted a number of

02:13  25   declarations attesting to --

1       THE COURT:  And I've read them.

2       MS. LAFAILLE:  -- how unusual what happened here was.

3   And, particularly, the efforts to withhold information about

4   Miss Ozturk's whereabouts from her counsel and from even

02:14  5   counsel for the government make this case particularly unusual.

6       The declarations submitted by the government's witness

7   at paragraph 20 talks about how at the time of petitioner's

8   request there was no known counsel of record, and once, through

9   the filing of this habeas, there was attorney contact

02:14  10   information, it was provided to the people in Louisiana so that

11   she could call counsel from Louisiana.

12       So, in other words, it was deliberately not provided

13   to people who were with Miss Ozturk and who could have helped

14   her call counsel, which, as her declaration attests, she was

02:14  15   asking to do.  That information was withheld from those who

16   could have given it to her at a time when she could have used

17   it to call counsel before being sent to Louisiana.

18       And I want to --

19       THE COURT:  Counsel, I can't recall if it's in the

02:15  20   submission by the government here or reflected in the papers

21   that were filed in the *Khalil* case where I've read the papers

22   in that case as well, but I imagine one of the responses from

23   the government is going to be in regards to some internal ICE

24   rule about having detainees have contact with their attorneys

02:15  25   within 24 hours of their detention.

1          What, if anything, would you have me make of that, of

2     that rule?

3          MS. LAFAILLE:  Well, she didn't, first of all.  She --

4     again, despite -- I think even if your Honor saw nothing

02:16  5     unusual in the fact that she couldn't call counsel within the

6     time that she was in Massachusetts and Vermont, it's still

7     quite unusual that even the government's own lawyers were not

8     told despite their efforts to learn their whereabouts, where

9     she was.

02:16  10          There's an added feature here, which is this Court's

11     order on Tuesday night close to 11:00 p.m. which instructed the

12     government not to move Miss Ozturk out of Massachusetts except

13     after 48 hours of notice.  The government getting that order

14     and knowing she was out of Massachusetts at the time of that

02:16  15     order had a couple of choices, one of which was coming to the

16     Court to say, hey, actually, she's already out of

17     Massachusetts, and obviously that wasn't the route taken.  The

18     route taken instead was to ignore the order and not disclose

19     her location to her counsel.

02:17  20          It's particularly notable because the intention of

21     that order is stated in the order, and it's to preserve the

22     status quo.  Even if the status quo at that moment was that she

23     was in Vermont, what the government did was the opposite of

24     preserving the status quo, which was secretly whisking her away

02:17  25     and making sure no one would know where she was until she was

1   in Louisiana.

2          THE COURT:  Counsel, before I interrupted you with a

3   question before, I think you were moving to the other matter of

4   place of confinement, which I'm also interested in hearing

02:17  5   about.

6          MS. LAFAILLE:  So I think these are interrelated

7   concepts, of course.  In terms of the -- the government has

8   separated them in their brief, but the general rule, sue the

9   immediate custodian, sue the immediate custodian where the

02:18 10   custodian is, and, of course, that's also generally where the

11   petitioner is.  For the idiosyncratic reasons here, the vehicle

12   the petitioner was in had already crossed state lines.

13          We think, generally, the rule about suing in the

14   location of confinement is really just an expression of the

02:18 15   ordinary principle that we sue the immediate custodian in the

16   location where the immediate custodian is.

17          The same exceptions -- the exceptions we discussed

18   with regard to the immediate custodian is also relevant here.

19   Where the custodian is unknown, it's permissible to sue someone

02:19 20   higher up in the chain in the place where that person is.  Of

21   course, that's what we've done, and then here we have all of

22   these unusual circumstances involving efforts to make it

23   difficult for anyone to learn where Miss Ozturk was.

24          THE COURT:  And so, counsel, that language from the

02:19 25   concurrence in *Padilla* if I'm following correctly.

1          MS. LAFAILLE:  With regards to the -- yes, the purpose

2     of removing to make it difficult, exactly.

3          THE COURT:  So, counsel, other than the concurrence in

4     *Padilla*, what else do I -- do you rely on in regards to the

02:19  5     place of confinement?  And I understand your point that they're

6     interrelated, although a number of the cases seem to treat them

7     differently.

8          MS. LAFAILLE:  Yes.  The place of confinement, again,

9     this is not a situation where they're talking about subject

02:20 10     matter jurisdiction.  We're talking about habeas petitions,

11     which are meant to be equitable.

12          And I also want to go back to the purpose of these

13     rules, which is to prevent forum shopping.  The purpose of

14     these rules, of course, is to make sure that a petitioner

02:20 15     cannot simply choose which level of official they're going to

16     sue or sue a national official in any jurisdiction of their

17     choice in the United States.

18          Here we have the opposite situation.  We really have a

19     situation where the government is forum shopping, that is

02:20 20     whisking away a petitioner to its forum of choice and doing

21     everything in its power to ensure that a habeas petition cannot

22     be filed and then seeking the dismissal of this petition or a

23     transfer to its forum of choice.

24          So particularly keeping in mind that we're not talking

02:21 25     here about subject matter jurisdiction, and there's no question

that there's personal jurisdiction, this really is about

implementing venue and implementing the intention of the habeas

statute, which again is to -- is set up to prevent petitioners

from forum shopping and having a choice of forum.

02:21   Here, Attorney Khanbabai sued in the only forum she

really could have sued in unless she was going to sue in

multiple forums, which, as is pointed out in the recent

District of New Jersey opinion, might raise ethical questions

if she can't have a good faith basis to assert that her client

02:21   is in a particular forum.

THE COURT:  And so I appreciate the argument.  I think

that is invoking the language in Justice Kennedy's concurrence,

I think, as the government has pointed out in their papers.

Although it was the concurrence, it was joined by two justices.

02:22   I was unable, as I think the judge in *Khalil* was unable, to

find any case in which a court has relied on that exception for

the purposes of finding jurisdiction where the petitioner was

not in -- was not in confinement in the district of which the

petition was filed.

02:22   So what do you say to that?

MS. LAFAILLE:  I think in looking at all those cases

the thing they have in common though is that the petitioner is

in another facility that has another custodian.  There

aren't -- I don't think we've seen a case where the petitioner

02:23   is in transit.  I'm not aware of one where these rules about

habeas jurisdiction are being applied in such an unbending way

to someone who is in transit still within the custody and

control of the official in the state in which she was arrested

and in which the petition was filed.

THE COURT:  Thank you.

MS. LAFAILLE:  And then, lastly, your Honor, largely

for the reasons in the *Khalil* opinions, if the Court determines

that Massachusetts is not an appropriate forum for this case,

then transfer to Vermont would be the appropriate remedy, not

dismissal or transfer to Louisiana.  And that's simply, I

think, explained quite well in the *Khalil* decisions but also

just a straightforward application of 28 U.S.C. 1631.

THE COURT:  Right.  And I understood from the papers

that you were relying on 1631, although I think the Southern

District had invoked 1404 or 1406, but your argument is under

1631.

MS. LAFAILLE:  Yes, your Honor, and we also have

specific case law in the First Circuit *Federal Home Loan Bank*

*vs. Moody's Corp.*, 821 F.3rd 102, that speaks specifically to

1631.  Questions have been raised about whether that provision

applies when there's an issue of personal jurisdiction as

opposed to subject matter jurisdiction.

So, in the First Circuit, it is law that any kind of

jurisdiction if there's an issue of habeas jurisdiction,

personal jurisdiction, that also is cause to apply this

1    provision, and that decision also makes clear that the law in

2    the First Circuit creates a presumption of transfer in that

3    circumstance and it's only when it has to be found that it's

4    not in the interest of justice to transfer the case that the

02:25  5    analysis would result in not transferring.

6        THE COURT:  Right.

7        MS. LAFAILLE:  And I think for all the reasons we were

8    discussing with regards to the application of the *Padilla*

9    exceptions, we think it's certainly in the interest of justice

02:25  10   if the Court concludes that this is not an appropriate venue to

11   transfer the case to Vermont.

12       THE COURT:  And so 1631 is invoking the want of

13   jurisdiction of the transferring court.  Okay.

14       MS. LAFAILLE:  Correct.

02:25  15       THE COURT:  So, counsel, is it as an operation of 1631

16   or as of case law that the petition filed here would be taken

17   as having been filed on the evening of March 25th in Vermont?

18       MS. LAFAILLE:  As the *Khalil* decision in New Jersey I

19   think very well analyzes this provision, I think it could be,

02:26  20   just the text of it that it would be taken, proceed as if it

21   was filed in that court at the time it was filed.

22       THE COURT:  Thank you.

23       MS. LAFAILLE:  Thank you, your Honor.

24       THE COURT:  I'll hear from the government on this

02:26  25   point about jurisdiction.

1          MR. SAUTER:  Thank you, your Honor.

2          I'll start with where counsel started with the general

3     rules that everyone understands apply to habeas provisions,

4     which require for a court to have habeas jurisdiction that the

02:26   5     petition needs to be filed in the district of confinement and

6     needs to name the immediate custodian over the petitioner.

7          In this case, neither of those two general rules that

8     have been called longstanding rules by the Supreme Court were

9     followed.

02:27  10     THE COURT:  And, counsel, can the petitioner really be

11     faulted for that here given the circumstances that have become

12     clear even from the government's affidavit?

13          MR. SAUTER:  At the time of the original filing, no,

14     your Honor.  I don't think petitioner can be faulted for filing

02:27  15     the petition in Massachusetts.  Certainly at the time the

16     amended petition was filed on March 28th, it was clear at that

17     point that the district of confinement was the Western District

18     of Louisiana for at least three days at that point, two and a

19     half days, and the immediate custodian of that facility was

02:27  20     also known at the time, in time of the amended filing.

21          THE COURT:  Counsel, and I know your sister is

22     pointing me to the overlap of these considerations of place of

23     confinement and immediate custodian, but I'd like to hear you

24     in regards to the argument about the Court not needing to reach

02:28  25     any exception as to the immediate custodian given the transient

1  nature of her location at whatever it was, 10:03 or 10:05, on

2  the evening of March 25th.

3       MR. SAUTER:  I think, based on the standard practice,

4  an exception would need to be reached here because, again,

02:28  5  district of confinement, this petition was not filed in the

6  district of confinement and an immediate custodian was not

7  named, nor sister counsel indicates that she believes that the

8  immediate proper custodian was named in that supervisory

9  officials were named to the petition, but this is from the

02:28 10  Supreme Court to the First Circuit, down to this district court

11  that supervisory officials, such as the field office director

12  of ICE, even if that field office director covers New England,

13  is not a proper respondent to a habeas petition.

14       And *Vasquez*, the First Circuit case, discussed this

02:29 15  with, in that case, the petitioner had named that when INS, the

16  district director for Boston, First Circuit said, well, did not

17  name the respondent, the proper respondent, which was the INS

18  district director in Louisiana.

19       So, in this case, the proper respondent would have

02:29 20  been an ICE field office director that had jurisdiction,

21  immediate jurisdiction over Vermont where petitioner was at the

22  time.

23       THE COURT:  But that was unknown at the time.  So,

24  counsel, you've talked about *Vasquez*.  There was language there

02:29 25  about exceptional circumstances, right, in regards to the

immediate custodian where there's either furtiveness or bad
faith by the government.  It's an "or", so I don't think the
Court has to find both.  It can find either or.  Why shouldn't
I apply -- if for some reason I wanted to apply the unknown
exception, why shouldn't I reach that exception?

MR. SAUTER:  Yes, your Honor.  So *Vasquez* dealt with
two different potential extraordinary circumstances that the
First Circuit could imagine.  First was in citation to
*Demjanjuk* from Judge Bork where it said if petitioner was being
held at an undisclosed location.  The second was when there was
the facts that indicated that movement out of the district was
done to manipulate jurisdiction.

I'll take the first extraordinary circumstance, if
that's fine with your Honor, in terms of being held in an
undisclosed location.  So, again, this citation was from the
*Demjanjuk* case.  If you look at the facts of that case, it
dealt with an individual who was subject to immediate
extradition from the United States who was being held in a
confidential location.  Judge Bork acted on the petition,
saying that it won't make sense for the public to learn of the
location of the individual.

The facts in this case are dramatically different.
Within 24 hours of the arrest, petitioner's location was known.

THE COURT:  But, counsel, isn't the period I'd be
looking at when the petition was filed and at that time it was

1    unknown?  It was undisclosed.

2         MR. SAUTER:  It was undisclosed.

3         THE COURT:  I should take that back.  It was known to

4    the government but not disclosed to the petitioner.

02:31  5         MR. SAUTER:  It was not disclosed to the petitioner at

6    that time.  That is true.  And, again, going to the *Demjanjuk*

7    decision, as the Court pointed out earlier, the language from

8    Judge Bork says, at the point when the disclosure, when we

9    learn where the individual is, if that individual is not in the

02:32 10    D.C. circuit, then the circuit loses jurisdiction over that

11    individual.  So that would be the case here when the next day

12    this was not an unknown location anymore, not an undisclosed

13    location.

14         THE COURT:  But it certainly was at the time the

02:32 15    petition was filed, counsel, right?

16         MR. SAUTER:  Yes, your Honor.

17         The other cases cited by the petitioner when she

18    discusses the unknown custodian also show the difference from

19    this case.  Those involved enemy combatants, Al Qaeda members

02:32 20    who were being held by the military overseas.  Those were the

21    first two cases cited.  The third case was a national class

22    action about detainees.

23         THE COURT:  Are we still talking about *Vasquez*?

24         MR. SAUTER:  This is talking about *Vasquez* because

02:33 25    it's talking about the undisclosed location, which is this same

1    exception that's referenced by petitioner as the unknown

2    custodian exception, I believe.

3        THE COURT:  But I guess, counsel, I mean, I know that

4    *Vasquez*, as I think you mentioned, does mention that case, but

02:33  5   I'm not sure that they're exactly the same, right?  One is

6    about unknown, and the other I suppose could also be unknown,

7    but it seems focused on government conduct.

8        MR. SAUTER:  Yes, your Honor.  And, again, with the

9    government conduct here, and I think this also touches the

02:33 10   second possible extraordinary circumstance set forth by the

11   *Vasquez* court, whether there's an attempt to manipulate

12   jurisdiction, the government would argue here that there was no

13   attempt to manipulate jurisdiction.

14       The driving force for the transfer of petitioner

02:34 15   outside of Massachusetts was the fact that there is no detainee

16   facility, no facility to detain female detainees in

17   Massachusetts.

18       THE COURT:  And, counsel, I've read all of the

19   affidavits, right, filed by the government and the multiple

02:34 20   ones filed on petitioner's side.  I see reference in the

21   government's affidavit to sort of a characterization of the

22   movement of detainees being routinely conducted after arrest

23   due to operational necessity and considerations.  It doesn't

24   say anything about the timing of any detainee moves, and I now

02:35 25   have a number of affidavits from immigration attorneys

experienced in this field and working within this region who

say that the timing of these moves is not -- is not routine and

common.

Isn't that something I can look at under the *Vasquez*

02:35 exceptions?

MR. SAUTER:  I think what your Honor can look at is

the reasons set forth by ICE as to why she was transferred out

of Massachusetts and when those decisions were made.  Those

decisions were made prior to her arrest, which means they were

02:35 made prior to the filing of this habeas petition.  Prior to her

arrest it was determined that there is no detention facility in

Massachusetts where she could be detained.

So if she was transferred -- any places she'd be

transferred to after her arrest would be outside of

02:36 Massachusetts.  It was then determined that there was detention

location space for her at a female facility in Louisiana.  As a

result, a plan was put in place, which led to her transfer out

of Massachusetts to Vermont and then to a flight the next, very

early the next morning.

02:36 THE COURT:  I'm not sure, counsel.  Which way does

that cut in regards to the issue your sister brings up about

that counsel, even after the petition was filed on her behalf,

didn't know her whereabouts?  Like, I'm not sure that -- I'm

not sure that the prior arrangements made by the government are

02:36 a fact in the government's favor in this analysis.

1          MR. SAUTER:  I think the prior arrangements made by

2     the government show that there was no attempt to manipulate

3     jurisdiction of a habeas petition when that habeas petition had

4     not yet been filed when those arrangements were made.  If a

02:37 5     habeas petition is filed and then there was a flurry of

6     activity to try to bring a person outside of the jurisdiction

7     of that court, I think that would be the attempt to manipulate

8     jurisdiction.

9          THE COURT:  But what do you say to your sister's

02:37 10     argument that the flurry of activity actually continued after

11     the petition was filed and the government was on notice that it

12     had been filed and that she was represented?

13          MR. SAUTER:  The government activity that continued

14     was activity that had already been set in place prior to the

02:37 15     petition being filed.  She was being moved to Vermont so she

16     could spend the night in Vermont and then be able early morning

17     to take a flight out of Vermont.

18          THE COURT:  And, counsel, doesn't -- shouldn't that

19     movement be effected by an order entered by this Court?

02:38 20          MR. SAUTER:  If the petitioner was inside of

21     Massachusetts and the government learned that there was an

22     order prohibiting her departure or transfer outside of

23     Massachusetts, then that movement certainly would be effected

24     by such an order, but when she was not in Massachusetts, an

02:38 25     order that says, do not move from Massachusetts does not have

1  that same effect.

2       THE COURT:  Even if the respondents have nationwide

3  authority presumably?

4       MR. SAUTER:  Even if the respondents have nationwide

02:38  5  authority?  The language of the order still says do not move

6  outside of Massachusetts, which does not affect a situation

7  when a person is already outside of Massachusetts.

8       THE COURT:  And, counsel, just to move on to another

9  consideration, still focused on *Vasquez*, counsel, in this

02:39 10  situation under *Vasquez*, the exceptions, can the Court consider

11  the circumstances of the arrest itself in regards to

12  furtiveness or bad faith?

13       MR. SAUTER:  I don't believe there's language in

14  *Vasquez* that would allow a court to consider the circumstances

02:39 15  of the arrest, your Honor.

16       THE COURT:  Why would that be, counsel?

17       MR. SAUTER:  I think what *Vasquez* is concerned about

18  is a transfer from district of confinement, and the arrest

19  itself is not related to the transfer outside of the

02:39 20  jurisdiction.  *Vasquez* is looking at if extraordinary

21  circumstances exist in an undisclosed location or if ICE

22  spirited the individual to another jurisdiction in an attempt

23  to manipulate jurisdiction to a different district.  The

24  lawfulness of the arrest itself --

02:40 25       THE COURT:  I'm not talking about the lawfulness.  I'm

1    talking about the circumstances.

2          MR. SAUTER:  I'm not sure I -- I'm not sure I

3    understand the circumstances that you are referring to in terms

4    of how it may affect.

02:40  5          THE COURT:  So whether or not -- so in regards to

6    identification or where the petitioner was going to be

7    transferred.

8          MR. SAUTER:  The information that we have, your Honor,

9    from ICE is that the decision was made before of where she was

02:40 10   going to be transferred because there's not a detention

11   location in Massachusetts for female detainees.

12         THE COURT:  Do I know anything in the record about

13   what the petitioner was told at the time that the agents

14   arrested her in regards to where she was headed?

02:41 15         MR. SAUTER:  No, your Honor.  Your Honor did reference

16   earlier a detainee transfer policy that Judge Furman cited to

17   in *Khalil*, Southern District of New York.

18         THE COURT:  This is in regards to the contact with

19   counsel?

02:41 20         MR. SAUTER:  Exactly, your Honor.  A few things that

21   come into play with that.  At the time of petitioner's arrest,

22   ICE did not have a counsel of record for petitioner.  For ICE

23   to have a counsel of record, the petitioner's counsel needs to

24   submit a form called a G-28.  No G-28 had been submitted prior

02:41 25   to her arrest on behalf of petitioner.  That's set forth by ICE

in their declaration.

But the transfer policy, the language in the transfer policy indicates that the individual is not, does not have the opportunity to contact counsel until the individual arrives at the final destination.

So here on the night of her arrest, that was not her final destination in Vermont.  Her final destination was next day in Louisiana.  After she arrived in Louisiana, she was able to contact her attorney.

THE COURT:  And so I guess, counsel, to ask you the flip side of what I asked your sister on this particular issue, I understand that ICE might have a policy in that regard but don't I get to consider that circumstance along with the other circumstances under *Vasquez*, at least as to this issue about the immediate custodian?

As I understand the affidavits that I now have, there's an affidavit that the petitioner was not able to contact her attorney, and obviously I had previously heard from her counsel that she wasn't able to locate her client.

So, as I said, the flip side of what I asked your sister, isn't that something I can consider?

MR. SAUTER:  I think certainly that can be considered in the analysis of whether the petition was filed in the proper court.  If she was not able to contact her attorney to say, I am in Vermont, then, as the Court asked earlier, can

petitioner's counsel be faulted for not filing in Vermont, and the government does not fault the petitioner's counsel for filing in Massachusetts.

Does her inability to contact her attorney on the night of her arrest bring this into an exception?  That's been discussed in *Vasquez* or in a concurrence and indeed is a different question.  I think that question cuts against petitioner, that it does not bring us into an exception because ICE following the policy that it follows did not allow a phone call to be made that evening is not bad faith or is not an attempt to keep someone in an undisclosed location or to prevent the awareness of where the individual is going to be. That awareness came the next day, midday the next day, when it was apparent she was in Louisiana.

THE COURT:  I wasn't suggesting that circumstance alone, but it's one of the circumstances the Court could consider.

MR. SAUTER:  I think the Court can consider that and I think the Court would also, in that consideration, look that it -- that action follows directly in accordance with an ICE policy.

THE COURT:  And, counsel, I focused my questions on this immediate custodian issue, but in regards to the place of confinement, which you also mentioned, counsel, what do you say to your sister's arguments in regards to *Padilla* and otherwise?

```
 1              MR. SAUTER:  Place of confinement can't be swept away
 2    as one of the longstanding rules that the Supreme Court in
 3    Vasquez has looked at as a necessary precondition for the
 4    district court to exercise jurisdiction over a habeas petition
 5    because, again, the Court's order would be directed to
 6    custodian of the individual in the place of confinement.  If
 7    the individual is not located in the district that the Court
 8    sits, then the Court doesn't have jurisdiction over that
 9    person, the custodian.
10              So even in the Demjanjuk case where it was found to be
11    an exception of the immediate custodian rule, the court there
12    was quick to note that once we learn the district of
13    confinement, if it's not District of D.C., then the Court
14    doesn't have jurisdiction.
15              And that same reasoning was used by the Khalil court
16    in New Jersey where the court there said, even if it is an
17    unknown custodian, proper district for the petition to be heard
18    still has to be in the district of confinement.  That's why the
19    New Jersey, the Khalil New Jersey court said that was in New
20    Jersey where she was detained at the time that the petition was
21    filed.
22              THE COURT:  You mean in terms of the transfer between
23    the Southern District and New Jersey?
24              MR. SAUTER:  Correct, your Honor.
25              THE COURT:  And so, counsel, on this last point, and
```

1    some of it I think you anticipated when I was asking you about

2    *Vasquez*, why not consider the exception suggested in the

3    concurrence?

4              MR. SAUTER:  From *Rumsfeld v. Padilla*?

02:47   5          THE COURT:  From *Padilla*.  From *Padilla*.

6              MR. SAUTER:  The Court doesn't need to consider it

7    because it's not binding.  It's not holding from that Supreme

8    Court case as Judge Furman in Southern District of New York

9    discussed, but even if court -- well, I'll add the second point

02:48  10    to that, and I think the Court mentioned this earlier.

11    Petitioner, in her briefing and argument here, was not able to

12    provide any case nationwide that has applied the concurrence

13    from *Padilla* to obtain relief, and Judge Furman made that point

14    also.

02:48  15          But even if we look at those proposed exceptions from

16    *Padilla*, I think we've discussed parts of them.  The first

17    talks about ICE not being forthcoming with respect to the

18    identity of the custodian or the place of the detention.  All

19    of that information was known less than 24 hours after the

02:49  20    arrest on the next day.  So we're not in a situation where

21    someone was being held in an undisclosed location for a

22    determinant time.

23              THE COURT:  But wasn't it a period, counsel?  I guess

24    that's -- I mean, isn't my focus on when the petition was

02:49  25    filed?

1          MR. SAUTER:  When the petition was filed, your Honor,

2     they -- petitioner's counsel did not know where she was.

3     That's not the same thing as ICE not being forthcoming about

4     her location.  ICE was still in the process of transporting her

02:49   5     through Vermont at the time that the petition was filed.  There

6     hadn't been -- it would be a -- perhaps it would be a different

7     situation if there was communication prior to the petition

8     being filed and that information was not disclosed.

9          THE COURT:  Counsel, let me ask a better question.  I

02:50  10     think *Padilla* also talks about the movement of the petitioner

11     or of a petitioner as being one of the issues that could lead

12     to the application of this exception that Justice Kennedy

13     discussed.

14          MR. SAUTER:  Right, whether there was an indication

02:50  15     that the purpose of the transfer was to make it difficult.

16          THE COURT:  Yes.

17          MR. SAUTER:  ICE, through a sworn declaration, stated

18     the purpose of the transfer was to -- was because there was not

19     facilities within Massachusetts where she could be detained and

02:50  20     the purpose of the transfer was to take her to a location where

21     she could be detained.

22          THE COURT:  But that doesn't stand as undisputed on

23     the record now, does it, given the affidavits that have been

24     filed in regards to bed space and processing and the timing of

02:51  25     movement?

1        MR. SAUTER:  There's no bed space within, no detention

2   space within Massachusetts where a female detainee could be

3   detained for purposes of removal proceedings, which is why she

4   was detained.  So, in Massachusetts, there's none, no space for

02:51 5   female detainees.

6        THE COURT:  Right, but I guess -- isn't the *Padilla*

7   exception a little bit broader than that in regards to not just

8   about -- not just about the whether or not she's in

9   Massachusetts but whether or not she's being moved in a manner

02:51 10   in which it would make it difficult to determine where you

11   would file the petition?

12        MR. SAUTER:  Right, and I think this was discussed

13   before the southern district with Judge Furman in the *Khalil*

14   case.  The petitioner there tried to say the swift transfer

02:52 15   across a number of states brought upon this concurrence.  Judge

16   Furman there said no.  What the concern was in *Padilla* was

17   continuous movement so he could never be in one location to

18   allow the habeas petition to catch up.

19        THE COURT:  Right.

02:52 20        MR. SAUTER:  The transfers here were made so she could

21   get to the location where the habeas petition could be filed

22   the next day when she was in Louisiana.  So the transfers here

23   were not done in a way to try to, you know, stay ahead of the

24   habeas petition.  They were done to put her in a location where

02:52 25   she could be on a flight at five in the morning to end up at

1    the location that had been determined for her prior to her

2    arrest, prior to a habeas petition.

3          THE COURT:  Counsel, obviously your sister would have

4    me take a different interpretation of the facts here, and

02:53  5    obviously the *Khalil* case, I don't know what factual

6    development was made in regards to what the regular and routine

7    practice is, but I appreciate the argument.

8          Counsel, if I -- I don't know if you have anything

9    further to say on this point, but I know the government is

02:53 10    seeking dismissal of the petition, but if I were to choose not

11    to dismiss the petition, you argue in the alternative that I

12    should send this to the Western District of Louisiana.

13          Why should I do that as opposed to Vermont where this

14    petition could have been filed at the time that it was filed?

02:53 15          MR. SAUTER:  Thank you.  I will address that one very

16    quick last point on the --

17          THE COURT:  Sure.

18          MR. SAUTER:  -- the questions have been about the

19    unusual nature of transfers.

02:54 20          THE COURT:  Yes.

21          MR. SAUTER:  There was a recent news article that was

22    cited and the government's response involving a female

23    scientist who was detained at Boston Logan Airport.  She was

24    detained by Customs and Border Protection.  She was turned over

02:54 25    to ICE.  She was transferred from Massachusetts to Vermont, on

1    a flight from Vermont to Louisiana.  This happened I believe in

2    mid February.  So this circumstance that is alleged to have

3    been very unusual --

4         THE COURT:  Yes.  I guess the difference is, counsel,

02:54  5    whether recent is regular, but I understand your point.

6         MR. SAUTER:  Thank you.

7         THE COURT:  I'll give it consideration.

8         MR. SAUTER:  Thank you, your Honor.

9         In terms of a proper venue for this case to be

02:54 10    transferred, so the government argues that they should be

11    transferred to the Western District of Louisiana because it is

12    the district of confinement.  The immediate custodian is known.

13    And when the transfer statutes, three of which have been cited

14    by the Court earlier, they look at where the petitioner might

02:55 15    have been brought or could have been brought.

16         The time that the amended petition in this case was

17    filed, there's only one location and first district where the

18    amended petition could be filed, and that's the Western

19    District of Louisiana at that time as the district of

02:55 20    confinement and the immediate custodian is known.  So a

21    transfer to the District of Vermont at this point, the court

22    there does not have jurisdiction over an immediate custodian

23    and the petitioner is not in that district either.

24         THE COURT:  Counsel, isn't it sort of common in civil

02:55 25    cases that an amended pleading would relate back to the

1    original pleading?

2            MR. SAUTER:  In civil cases, yes, generally.  I think

3    here where we're dealing with the filing of a habeas petition

4    in a proper district when there's two longstanding rules that

02:56  5    when an amended petition is filed that is not in a proper

6    district, it doesn't make sense for it to be transferred to

7    another district that is also not proper because that district

8    doesn't satisfy the longstanding rules.

9            THE COURT:  But you're aware of the decision I might

02:56  10   find persuasive out of the District of New Jersey?

11           MR. SAUTER:  I am, your Honor.  The only -- the thing,

12   the distinguishing factor there is there was not an amended

13   petition that was filed and it wasn't filed at a time when this

14   was clear as to district of confinement and immediate custodian

02:56  15   over the petitioner.

16           THE COURT:  Thank you.

17           MR. SAUTER:  Thank you, your Honor.

18           THE COURT:  Counsel, if you want brief rebuttal.

19           MS. LAFAILLE:  Thank you, your Honor.

02:57  20           I guess I'll start here with the point about the

21   amended petition.  I don't think the government has cited a

22   single case where that is at all relevant for the

23   jurisdictional analysis here.  And, again, this plays very much

24   the wrong way into the concern for forum shopping that's at the

02:57  25   heart of these rules.  It's not possible at the time in these

1    cases where a petitioner is quickly being moved and the basis

2    for detention, the circumstances for detention, are unknown.

3    It's not possible to have a fully fleshed out habeas petition.

4         What the government is saying is, essentially, parties

02:57  5    should be penalized for amending habeas pleadings and that

6    should leave the government to be able to choose its forum.

7    And that just sets a very strange and dangerous precedent here.

8         I also want to go back to the -- actually, just to

9    stay on that point for a moment, it also cuts against ex parte

02:58 10    *Endo* and I thought the very persuasive points --

11         THE COURT:  Meaning where it's filed in the proper

12    district initially and someone has transferred after that?

13         MS. LAFAILLE:  Exactly, your Honor.  And nothing about

14    amendment changes that.  I think your Honor has it right that

02:58 15    the relevant thing for habeas is the time of filing.  Your

16    Honor referenced the language in Judge Bork's opinion.  That's

17    not binding on the Court and contrary to ex parte *Endo* which

18    makes clear that it's the time of filing.  It's the

19    jurisdiction at the time of filing that matters.  We think that

02:59 20    was established here.

21         I also would point to the compelling language in the

22    District of New Jersey opinion in this regard about gaps in

23    habeas jurisdiction.  We can't interpret these rules in a way

24    that would create periods of time when there's effectively no

02:59 25    habeas jurisdiction and no habeas petition can be lodged.  That

1    would --

2            THE COURT:  In terms of the travel of a detainee?

3            MS. LAFAILLE:  Correct, your Honor.

4            What the government is saying essentially is there is

02:59  5    no way in those early periods that a habeas petition could be

6    filed and considered if the government is making the choice to

7    move someone to their forum of choice and, essentially,

8    petitioners won't have the ability during those periods to file

9    petitions that would be considered.  That just runs contrary to

03:00 10   the suspension clause and ex parte *Endo*.

11           I also want to talk about this prior plan thing and

12   the government's argument that the prior plan somehow helps the

13   government.  First of all, the notion that the prior plan was

14   due to bed space constraints is not something the Court has to

03:00 15   credit.  It is in a sworn declaration, but it's a sworn

16   declaration of an officer who is claiming no personal knowledge

17   over that and is claiming to write this declaration based on

18   reviews of record systems and conversations with undisclosed

19   other people.

03:00 20           So I see nothing there that needs to be credited,

21   particularly when on the other side of that ledger there is

22   credible testimony, including the declaration of Miss Walsh,

23   Attorney Walsh saying that there's reason to think that there

24   was bed space in New England and that transfer --

03:01 25           The government says, of course, in this paragraph 6 of

this declaration, the portion over which we're talking about

that there is no personal knowledge, that there was no bed

space in a facility where essentially in New England, where the

petitioner would have been able to appear for an immigration

court hearing in New England. Attorney Sauter kept quoting no

space in Massachusetts. Of course, that's not the same thing

as the declarations. We know there is reason to think there

was bed space in New England.

         And the Court doesn't have to ignore what was

happening. The government was already embroiled in litigation

about Mr. Khalil and litigation of a number of other cases

similarly involving students and scholars arrested in response

to pro-Palestine protests. It does not have to -- the Court

does not have to ignore the question of venue as being

litigated, and the government would have had every incentive to

transfer Miss Ozturk quickly and not to inform her counsel and

to make it difficult essentially for counsel to learn her

location.

         The rule about calling counsel, again, even if that

wasn't violated, that says nothing about when counsel is making

affirmative attempts to reach the petitioner and, again, it

says nothing even about why even counsel for the government

were not told where Miss Ozturk was even though -- it appears

they were making, at least represented to us, that they were

making inquiries about her whereabouts, and that's particularly

1    troubling in light of the supposed prior plan.

2        If there was a prior plan all along and these

3    movements weren't happening in the spur of a moment fashion,

4    which I accept, then it's even more troubling that counsel for

03:03    5    the government won't have been informed about it at a time when

6    corrective action might have been taken.

7        The Russian scientist case that Mr. Sauter

8    mentioned --

9        THE COURT:  In a footnote, yes.

03:03    10    MS. LAFAILLE:  Somebody was transferred to Vermont.  I

11    appreciate that this is not in the record but I'm happy to get

12    an affidavit from this attorney.  That attorney spoke to his

13    client while she was in Vermont because her location in Vermont

14    was disclosed to him.

03:03    15        So, again, this just highlights the unusual nature,

16    like all of the declarations highlight, of what was done here

17    and I think makes abundantly clear that these circumstances,

18    even if they don't fall within the ordinary rule, which for the

19    reasons we've said we think they do, certainly fall within

03:04    20    exceptions that are intended again to be consistent with the

21    interest to prevent forum shopping to extend the jurisdiction

22    of habeas courts in equitable ways.

23        And, finally, on this point about the immediate

24    custodian, Mr. Sauter still hasn't been clear about which

03:04    25    custodian he thinks the petitioner should have named or could

have named.  I believe he said during his remarks that it would

have been the ICE field office director with control over

Vermont.  That is exactly who he named.  Because there's a New

England field office, a field office director sits in

03:05 Massachusetts in Burlington, and that person has control --

THE COURT:  This is Miss Hyde?

MS. LAFAILLE:  Yes.

I'll end just where I started.  I'm sure we've all

seen the video of Miss Ozturk being grabbed by ICE officers on

03:05 the street in Somerville.  If we could freeze that moment in

time and imagine a habeas petition being filed, which surely

she had the right to file if there was the wherewithal to do it

at that moment, it's clear that the --

I don't think Mr. Sauter is saying that the ICE

03:05 officer who was physically grabbing her would have been the

custodian.  The custodian had to be the person in control of

the New England area for ICE.  I took his remarks to be

essentially acknowledging that.  And that didn't change.  That

person in control did not change when the vehicle that

03:06 Miss Ozturk was in crossed state lines.

So we think this, although this is an unusual case

where the client was across state lines, she was in a vehicle,

her condition -- excuse me -- her custodian had not changed.

And for all of the reasons we've articulated, habeas

03:06 jurisdiction in this court is consistent with ordinary

1    principles of habeas jurisdiction and, if not, certainly the

2    government's behavior, ignoring a Court's order and whisking

3    her away, certainly give ample reason to preserve the

4    jurisdiction of this Court in Massachusetts.

03:06   5          THE COURT:  And, if not, in the District of Vermont,

6    counsel?

7          MS. LAFAILLE:  Well, we think this case --

8          THE COURT:  And if not, in the District of Vermont?

9          MS. LAFAILLE:  Sorry, your Honor.  I hear you now.

03:07 10    Yes.  Absolutely, your Honor.  If not here, then a transfer to

11    Vermont would be the appropriate remedy.

12          THE COURT:  Meaning I took those to be alternative

13    arguments as the government has made alternative arguments.

14          MS. LAFAILLE:  Yes, your Honor.

03:07 15          THE COURT:  Counsel, I appreciate the arguments, thank

16    you, on both sides.

17          Counsel, I think there were other folks, some who are

18    on Zoom, that were queued up to address other issues.  To be

19    completely transparent, as hopefully my questions to both sides

03:07 20    suggested, I'm very focused on the jurisdictional issue, which

21    is very much a live issue here, so I'm inclined to wrestle with

22    that a little bit more and get a decision out in that regard.

23    And then if there are further proceedings, we would go from

24    there.  Okay?

03:07 25          Thank you, counsel.

1          THE CLERK:  All rise.

2          (The Honorable Court exited.)

3          (Adjourned, 3:09 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8            I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   April 3, 2025 in the above-entitled matter to the best of my

11   skill and ability.

12

13

14       /s/ Kristin M. Kelley                April 8, 2025

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25